In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-2467, 00-2587, 00-3098

Sharon Swarsensky Bilow,

Plaintiff-Appellant,
Cross-Appellee,

v.

Much Shelist Freed Denenberg
Ament & Rubenstein, P.C.,

Defendant-Appellee,
Cross-Appellant.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 7627--Ruben Castillo, Judge.

Argued February 21, 2001--Decided November 7, 2001

Before Posner, Kanne, and Diane P. Wood,
Circuit Judges.

Diane P. Wood, Circuit Judge.  Plaintiff
Sharon Swarsensky Bilow, an attorney
proceeding pro se, filed this lawsuit
against her former employer, the law firm
of Much Shelist Freed Denenberg Ament &
Rubenstein, P.C. (Much Shelist), alleging
violations of the Employee Retirement
Income and Security Act (ERISA), Title
VII of the Civil Rights Act of 1964
(Title VII) and several state laws. Bilow
has two principal complaints: first, that
Much Shelist owes her money for
wrongfully denied employee benefits, and
second, that it violated the law when it
fired her either because it discriminated
on the basis of her sex or because it was
impermissibly retaliating against her for
certain protected complaints. We agree
with the district court that Bilow failed
to establish a genuine issue with regard
to any material fact, and we therefore
affirm the district court's grant of
summary judgment for Much Shelist.

I

A.  Health Insurance "Gross-Up" Program

Bilow began working as a litigation
associate at Much Shelist in 1982. Three

years later, she became the first woman to be promoted to income partner at the firm. At that time, the firm provided health insurance for its employees and their dependents. But in 1989, the firm stopped paying the insurance premiums for the dependents of employees and started deducting the premium amounts from the partners' paychecks. In order to make up the difference, the firm increased or "grossed-up" partners' salaries in an amount equal to the premiums for the dependent coverage. At the time of the change, Bilow was affected, because she had purchased health insurance coverage for her husband and children. As it did for all others in her situation, the firm began to deduct the premiums from Bilow's paycheck while increasing her salary in an equal amount.

In 1992, while Bilow was on maternity leave, the firm announced that it would no longer provide a gross-up to partners whose spouses' employers provided free dependent health insurance. For these partners, the gross-up would be phased out over the next two years. According to Bilow, she was never notified of the change, but her gross-up was phased out over the next two years and was completely eliminated by June 1, 1994. At the same time, the firm continued to deduct the dependent insurance premiums from her paycheck.

In March 1998, four years after the gross-up was completely phased out, Bilow noticed that the compensation listed on her W-2 form was less than her salary. Bilow immediately relayed this problem to Steven Schwartz, a member of the firm's Management and Accounting Committees. Schwartz responded that the firm did not pay for health insurance for those partners whose spouses received dependent health insurance from their own employers. According to Bilow, she told Schwartz that her spouse did not receive health insurance from his employer; Schwartz promised to investigate the situation and report back to Bilow.

Bilow waited about six weeks for the problem to be remedied or for someone to discuss the matter with her. When nothing happened, she sent a memo on April 29, 1998, to the firm's Management Committee requesting a response and an accounting:

It has been approximately six weeks since the firm has acknowledged that my salary has never been "grossed up" for the medical insurance deducted from my salary. Given the criminal liability attached to this failure to pay, which dates back to 1986/1 and continues to the present, I do not understand the firm's nonchalance. No one has even discussed the status of the matter with me.

On May 18, 1998, the Management Committee responded to Bilow with a memo explaining that the gross-up had been phased out over the time period between 1992 and 1994. In 1993, her gross-up was $2,000 and thereafter she received no extra pay to compensate for her dependent care coverage. The firm admitted that it had only "assumed" that Bilow's husband, a doctor, had dependent coverage through his employer. The memo concluded: "Please advise for the period 1993 to date whether or not your spouse had dependent coverage at his place of employment."

That same day, Bilow met with Michael Shelist, the head of the Management Committee, and told him that she had never been notified of the change in policy and that no one had ever asked her if her husband's employer provided health insurance for their family. Bilow told Shelist that, in fact, her husband did not receive dependent health insurance coverage from his employer. Shelist demanded that Bilow confirm this in writing and provide him with information about any other health insurance covering Bilow and her family. Although Bilow complained that Shelist had no right to make such a demand, Bilow delivered the requested memo to Shelist on May 27.

B.  Staffing of the Brouwer Case

Meanwhile, Bilow's primary responsibility since 1992 had been a large class action lawsuit filed in Indianapolis that was expected to earn a multi-million dollar contingent fee for the firm. The case, Brouwer v. Rochwarger, required the class to prove a complex RICO conspiracy among several ac counting firms, lawyers, and brokerage firms. Christopher Stuart, an associate at the firm, had been assisting Bilow with the litigation.

By the end of 1997, Bilow had billed almost 6,000 hours and Stuart had billed over 5,300 hours to the Brouwer case. In total, the firm had invested approximately $3 million of attorney time in the case but had recovered only about $800,000 in fees after settling with some of the defendants. As the May 1998 trial date approached, the firm's Management Committee became concerned about the likelihood of recovering even a portion of its expenses. The Committee scheduled a meeting with Michael Freed, the head of the firm's litigation department, to discuss the possibility of taking Stuart off the case. Freed told the Committee that he believed Bilow, along with local Indianapolis counsel, Hugh Baker, could adequately try the case alone. Freed based his opinion on several factors: most of the named defendants had settled or had been dismissed; the potential recovery against one of the defendants was minimal and did not warrant any more attorney time; he respected Baker's experience as a seasoned trial lawyer; and he had confidence in Bilow's ability as a litigator. On February 26, 1998, in a memo to Bilow, the Committee announced that, when the trial began, she and Baker would litigate the case by themselves in Indianapolis, although Stuart and others would be available in Chicago to provide assistance.

On March 10, 1998, Bilow met with Shelist and voiced her concerns about trying the Brouwer case with only Baker's help. Bilow believed that the case involved complex legal issues and she did not believe Baker to be up to the job. Bilow also informed Shelist that she would not be able to spend each night of the anticipated month-long trial in Indianapolis because her husband worked nights and she did not have alternate child care arrangements. Bilow suggested that she could commute daily to Indianapolis, and although the flight would not arrive in time for the morning session of trial, the Brouwer judge would not object to her being late every day. Shelist refused to permit her proposed commuting arrangement, and he also refused to assign anyone else to help her litigate the case.

Bilow and the firm came to an impasse on the matter: her position was that Shelist

was asking her to do the impossible, and that, even if the firm were to fire her, she could not stay in Indianapolis during the trial. She believed that the firm was responsible for arranging child care for its lawyers; the firm disagreed. The May trial date was ultimately continued, but Shelist reported the events of the meeting to the Management Committee, which shared Shelist's view that Bilow was being insubordinate. The Committeeinstructed Shelist to prepare a memo recording the events of the meeting and the circumstances of the conflict, which he did on April 30, 1998, almost two months after the meeting. (April 30, 1998 also happened to be the day after Bilow wrote the letter to the firm threatening "criminal liability" if it failed to compensate her for the past gross-up amounts.)

### C.  Partner Survey

Immediately after the March 10 meeting in which Bilow expressed her unhappiness with the Brouwer staffing decision, the firm conducted a non-anonymous survey of its partners. Bilow completed the survey and gave it to Shelist on March 20, 1998. In response to a request to list her "three most significant concerns about the firm," Bilow first complained about her compensation and then stated her opinion that "there is a ruling class at the firm and a ruled class and all the women in the firm are in the ruled class."

### D.  Termination

In May 1998, during the firm's fiscal year-end review, the Management Committee decided to lay off one senior-level attorney from its litigation department and one from its corporate department. The Committee chose a male from its corporate department and chose Bilow from the litigation department, based mainly on its belief that it could not rely on Bilow to try the Brouwer case, and that without Brouwer, there was not enough work to keep her busy. Freed told the Committee that Bilow's absence would not hamper the Brouwer proceedings and that he personally "did not wish to work with [Bilow] again because [he] found working with her to be extremely frustrating due

to her obstinate nature and frequent disregard of his counsel."

On June 1, 1998, two months after Bilow completed the survey and only four days after her most recent meeting with Shelist regarding the gross-up problems, Shelist informed Bilow that her employment was going to be terminated, effective June 8, 1998, because she was unwilling to try the Brouwer case as instructed by the firm and because there was insufficient work otherwise for a senior trial lawyer in the hourly litigation department.

On June 25, 1998, Shelist gave Bilow a letter entitled "Terms of Separation." In the letter, the firm acknowledged that it owed Bilow $16,600 in past compensation for its inaccurate phase-out of her gross-up. In order to receive the past due gross-up as well as sixteen weeks' severance pay, however, it insisted that Bilow release the firm and all of its shareholders from any claims arising out of her employment or termination.

After weeks of negotiation, Bilow refused to sign the release and on August 12, the firm gave her a check for an amount equal to the $16,600 past due gross-up minus the severance pay she had received since June 8. On August 10, Stuart settled the Brouwer case against the remaining defendants.

E.  Lawsuit

On November 20, 1998, Bilow filed discrimination charges with the EEOC claiming that the firm eliminated her gross-up as a result of sex discrimination, that she was terminated as retaliation for complaining about the loss of the gross-up, that the firm required her to try the Brouwer class alone as a result of sex discrimination, and that she was terminated in retaliation for objecting to the staffing decision. The EEOC issued a right to sue letter on January 28, 1999.

In the meantime, on November 25, 1998, Bilow brought her original complaint alleging violations of ERISA, Title VII, and state law. This 26-page, 132-paragraph complaint was dismissed without prejudice on the district court's own

initiative on February 26, 1999. The judge expressed the view that the complaint was "way overpled" and encouraged Bilow to "sit back and think about [pleading] 10 counts." Bilow ignored this advice, however, and filed her first amended complaint on March 19, 1999, which had the same 10 counts, but was even more massive, weighing in at 48 pages, 218 paragraphs, and 27 exhibits. Again, the district court dismissed the complaint without prejudice for failure to comply with Fed. R. Civil P. 8. Bilow's effort at a second amended complaint was again longer, with 10 counts, 52 pages, 223 paragraphs, and 34 attached exhibits.

Counts I and II of the second amended complaint allege that the firm violated ERISA by not providing Bilow with a summary plan description of the gross-up program, failing to notify her of a material change in her benefits, withholding benefits to which she was entitled under the gross-up plan, and firing her in retaliation for complaints about conduct that she believed to be in violation of ERISA. The rest of the federal claims arose under Title VII: Count VII alleged that the firm discriminated against her on the basis of sex in assuming that, because she is a woman, her husband's employer provided family health insurance. Count VIII alleged that the firm discriminated against her on the basis of sex in requiring her to try the Brouwer case alone. Count IX alleged retaliation for her complaints regarding the discriminatory administration of the gross-up program and Count X alleged retaliation for the comments she made in the partner survey. Bilow also brought several claims for salary and bonus payments under state statutory and common law.

The firm filed a motion to dismiss, arguing that the gross-up plan was not an ERISA plan. It argued that the Title VII counts were either untimely or failed to state a claim. Finally, it asked the court to exercise its discretion to dis miss the state law claims. After more procedural skirmishing, the court allowed Bilow to go forward to the summary judgment stage on her claim of sex discrimination related to the staffing of Brouwer and her claim of retaliation for

her complaint in the partner survey. It dismissed all the other federal claims. Bilow later added three more state law theories related to the gross-up. The firm filed a motion for summary judgment on the remainder of the federal claims on January 28, 2000, which the court granted on May 2, 2000. It found that Bilow had not shown that the firm treated males more favorably in the staffing of cases, nor did she have evidence that could establish a causal connection between her complaints in the survey and her discharge. The court declined to exercise supplemental jurisdiction over the state law claims. On May 17, 2000, the district court denied Bilow's Rule 59(e) motion to alter or amend the summary judgment ruling.

On June 6, 2000, Bilow filed a notice of appeal from all of the district court's orders. The firm filed a cross-appeal on June 19, 2000, challenging the district court's refusal to exercise supplemental jurisdiction over the state law claims. On July 28, 2000, the court granted judgment in favor of the firm for $2,554 in costs; on August 15, Bilow filed a notice of appeal from this judgment for costs.

II

A.  Issues on the Pleadings

We consider first the group of claims the court dismissed for failure to state a claim. These are the ERISA claims and the Title VII claim concerning the gross-up. We review these de novo, accepting all well-pleaded allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. Hentosh v. Herman M. Finch University of Health Sciences/The Chicago Medical School, 167 F.3d 1170, 1173 (7th Cir. 1999).

1.  ERISA Claims

Bilow alleged that the firm violated ERISA in several ways connected to the gross-up program and that she was discharged for complaining about those violations. The district court dismissed these claims on the ground that the gross-up policy was not an ERISA plan. This was because the gross-ups were paid

from the firm's general assets as part of its compensation plan. Although Bilow tried to challenge this finding for the first time in her reply brief, she conceded at oral argument that she had waived this challenge.

Based on this first finding, the district court also dismissed the claim that the firm retaliated against Bilow for exercising her rights under ERISA. The court ruled that the existence of an ERISA-governed plan was a prerequisite to an ERISA retaliation claim. This second finding is properly before us on appeal.

Section 510 of ERISA makes it unlawful for an employer to discharge "a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. sec. 1140. Bilow argues that even if the gross-up program was not an ERISA plan, sec. 510 should still apply as long as she made a reasonable, good-faith claim that the program was covered by ERISA and that an ERISA violation had occurred. In making this argument, Bilow asks us to borrow from Title VII's-anti-retaliation provision, which has been interpreted to prohibit retaliation against an employee who makes a reasonable good-faith claim that wrongful discrimination has occurred, even if the claim ends up being meritless. See Sweeney v. West, 149 F.3d 550, 554 (7th Cir. 1998). For purposes of argument, we will assume that she did have a good-faith claim that the gross-up program was governed by ERISA and that an ERISA violation had occurred.

Under some circumstances, courts do borrow aspects of Title VII law to use in interpreting ERISA. See, e.g., Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 576 (7th Cir. 1998) (utilizing McDonnell Douglas in the ERISA context). Nonetheless, this must be done with caution, as there are significant differences between ERISA and Title VII, and there are even differences between the anti-retaliation provisions of the two statutes. The most important of these is the fact that, unlike a Title VII retaliation plaintiff, an ERISA retaliation plaintiff must demonstrate that the employer had the specific intent to violate the statute and to interfere with an employee's ERISA rights. See Lindemann v. Mobil Oil Corp., 141 F.3d

290, 295 (7th Cir. 1998). With such a requirement, it is logical to infer that an ERISA plan is a condition precedent to an ERISA retaliation claim. Without an actual ERISA plan, it would be rather difficult to find that an employer specifically intended to violate an employee's rights under something that only arguably existed.

Other ERISA language also counsels against use of the Title VII analogy here. Under both Title VII and ERISA, a retaliation plaintiff must show that she belongs to "a protected class." See Little v. Cox's Supermarkets, 71 F.3d 637, 642 (7th Cir. 1995). Title VII protects the broad category of "individuals," see 42 U.S.C. sec. 2000e-3, but ERISA protects only employees who are "participants" and "beneficiaries" of ERISA-governed plans, see 29 U.S.C. sec. 1140. Without a plan, Bilow can be neither a participant nor a beneficiary. She thus stands outside the class of individuals ERISA protects.

Bilow has not cited any case in which a court allowed a sec. 510 retaliation claim to proceed in the face of a finding that there was no underlying ERISA plan. We agree with the district court that a plan must exist before a retaliation case is possible, which spells the end of this part of Bilow's case.

2. Title VII Claims Related to Gross-Up Mistake

Bilow alleged that the firm discriminated against her in the administration of the gross-up program by assuming, because she is a woman, that her spouse provided the health insurance for their family, and by not making the same assumption for married male partners. This assumption, she claims, was a violation of 42 U.S.C. sec. 2000e-2(a). She also claimed that the firm fired her in retaliation for complaining about the gross-up discrimination, in violation of 42 U.S.C. sec. 2000e-3(a).

The district court dismissed the retaliation claim because Bilow never asserted that the gross-up mistake resulted from sex discrimination, rather than just inadvertence or ignorance, when she complained about it. She has not ap

pealed from this ruling. It dismissed the underlying sex discrimination claim about the gross-up as untimely, since Bilow's complaint to the EEOC was filed more than 300 days after she reasonably should have discovered the change in her pay. This decision is the focus of her appeal on this part of her case.

In Illinois, a Title VII plaintiff must file a charge with the EEOC within 300 days of the alleged discrimination. See Snider v. Belvidere Township, 216 F.3d 616, 618 (7th Cir. 2000). Bilow states that her discrimination claim is based on the firm's stereotypical assumption that her husband was responsible for her family's health insurance coverage. This assumption was clearly made no later than 1993. Thus, on the face of things, Bilow filed her November 1998 EEOC charges well after the 300-day limitation period had passed.

Indeed, without belaboring the point, we find that not only on the face of the matter, but in all other ways, Bilow's charges were late. Equitable tolling does not apply here, as a reasonable person exercising due diligence would have discovered long before five years had elapsed that she was not receiving almost $5,000 a year and almost $200 a paycheck to which she was entitled. We also reject Bilow's argument that the firm should be equitably estopped from claiming untimeliness. She has not pointed to any active steps that the firm took to keep her from discovering its mistake; instead, she relies only on the fact that the firm never told her about the phase out of the gross-up. This is not enough, particularly since it was giving her monthly and yearly pay statements that revealed all relevant information. See Chakonas v. City of Chicago, 42 F.3d 1132, 1135-36 (7th Cir. 1994). Finally, this was not a "continuing violation," beginning in 1993 and repeating itself with every paycheck. See United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977); Dasgupta v. Univ. of Wis. Bd. of Regents, 121 F.3d 1138, 1139 (7th Cir. 1997). There was one discrete act--the decision to phase out the gross-up--which occurred in 1992. The Supreme Court has held that Title VII's statute of limitations begins to run when an employer implements a discriminatory policy, even if its effects are not felt

until many years later. See Lorance v. AT&T Tech., Inc., 490 U.S. 900 (1989); see also Dasgupta, 121 F.3d at 1140. The later events on which Bilow relies in part, such as the requests for her to turn over all insurance information and to sign a release--were merely lingering effects of the discriminatory assumption made in 1993.

The district court correctly found that these claims were barred by the Title VII statute of limitations. Because this is so clear, we can address it on the pleadings (technically under Rule 12(c), as it relates to an affirmative defense), and we need not address the question whether the gross-up claim is moot in light of the firm's eventual payment of the full $16,600 (but perhaps not with interest) to which she was entitled.

B. Summary Judgment Issues

After the district court's partial grant of the motion to dismiss, the only remaining federal claims were the Title VII claims of sex discrimination in the staffing of the Brouwer case and retaliation for complaining in the partner survey about sex discrimination at the firm. Both were dismissed at the summary judgment stage. We review the district court's grant of summary judgment de novo, and we draw all reasonable inferences from the record in the light most favorable to Bilow. See Ryan v. Wersi Elec. GmbH & Co., 59 F.3d 52, 53 (7th Cir. 1995). The non-moving party, however, cannot rest on the pleadings alone, but instead must identify specific facts to establish that there is a genuine triable issue. Id.

1. Sex Discrimination in Staffing of Brouwer Case

Bilow claims that the firm discriminated against her by requiring her to try the Brouwer case with only the help of local counsel. Male employees, she asserted, were never required to try similarly complex cases without substantial assistance. Both parties concede, and we agree, that there is no direct evidence of discrimination with regard to the Brouwer staffing decision. That leaves Bilow with the familiar indirect method

of proof established for Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the plaintiff must state a prima facie case of sex discrimination. Id. at 802. To establish this prima facie case, she must prove, among other things, that similarly situated male employees were treated more favorably than she was treated. Id.

Bilow has not pointed to any cases at the firm similar to Brouwer in which male attorneys received more staffing assistance. The cases on which male attorneys seemingly received more assistance were cases that were either more complex, or were not contingent fee cases, or took place in Chicago and therefore did not entail the same travel expenses. Bilow did not have a problem when the only help she was receiving came from Stuart and she has not established that sex discrimination had anything to do with the firm's assessment that Baker was as competent as Stuart for the task at hand. To the contrary, Freed told the Management Committee that Baker was a seasoned trial lawyer who was chosen by the Brouwer judge as lead counsel for the class. Finally, Bilow was only required to try the case alone (in the sense of having no help from Much Shelist); prior to trial and during trial she still had the opportunity to obtain assistance from firm lawyers in Chicago.

Even if Bilow had established her prima facie case, the firm's decision was justified by legitimate, nondiscriminatory reasons. See McDonnell Douglas, 411 U.S. at 802. The firm had already invested $3 million of its services in the case, and so far, after the dismissal of several defendants, had recouped only $800,000. In order to cut costs, it needed to reduce staffing on the case. Freed told the Management Committee that Bilow, with the help of local counsel, could adequately try the case since most of the defendants had been dismissed and the case against one of the defendants did not warrant any more time. A need or desire to cut costs is a legitimate nondiscriminatory justification for an adverse employment action. See Aviles v. Cornell Forge Co., 183 F.3d 598, 604 (7th Cir. 1999). Additionally, Freed told the Management Committee that he believed that the remaining issues were not complex and

that Bilow and Baker could handle the case alone.

Once the firm articulated a legitimate, nondiscriminatory reason for the staffing decision, the burden shifted to Bilow to show that the given reason was a pretext for discrimination. See McDonnell Douglas, 411 U.S. at 804. That she has not done. Her disagreement with Freed's analysis of the staffing demands on the case in no way indicates that Freed himself did not honestly believe that two lawyers were enough. See Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 541 (7th Cir. 1998) (employee must show that reason for discharge was a lie or not grounded in fact, not just that it was mistaken). She also points to a voice mail tape, made a year before the staffing decision, in which Freed said that Brouwer was a "long, hard case." But this vague statement is not only unhelpful, it is completely irrelevant to the state of the case a year after the statement was made and after several defendants were dismissed.

2. Retaliation for Survey Response

Bilow also argued that the firm fired her in retaliation for her statement on the firm survey to the effect that "there is a ruling class at the firm and a ruled class and all the women in the firm are in the ruled class." This survey was returned on March 20, 1998, and she was discharged a little over two months later. Her theory appears to be that her statement was a protected accusation of sex discrimination against the firm. Bilow contends that this two-month period between the receipt of the survey and her discharge establishes a "causal connection" between the two events.

We question whether a time lag of more than two months is suspicious on the facts presented here for the purpose of establishing retaliation, assuming for now that the statement was the kind of protected complaint to which the retaliation statute applies. See McClendon v. Ind. Sugars, Inc., 108 F.3d 789, 797 & nn. 5-6 (7th Cir. 1997) (citing cases in which causal connection was shown when time lag was a day or a week). Furthermore, Bilow needs more than a coincidence of timing to create a reasonable inference of retaliation: "The

mere fact that one event preceded another does nothing to prove that the first event caused the second." Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918 (7th Cir. 2000) (three month gap alone could not establish causal connection). "Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." Id. Bilow has not presented any evidence from which a trier of fact could determine that there was a causal connection between her survey response and her termination.

Even if Bilow had established the required causal connection, the firm has once again submitted legitimate nondiscriminatory reasons for the discharge--Bilow's inflexibility and the lack of work in her department--and Bilow has failed to give us any evidence that would show these reasons to be pretextual.

C.  Motion to Compel Production of Documents

During discovery, Bilow filed a Rule 34 motion to compel production of certain documents, including, among other things: (1) documents relating to the financial status of the firm, including attorney salaries and billing reports and (2) a letter written by Joseph Ament, the head of the Accounting Committee, to members of his synagogue, objecting to women leading religious services. On January 25, 2000, the court denied the motion with regard to these two types of documents, and Bilow now argues that this was an error. We review a decision of a district court denying a motion to compel for abuse of discretion. See Gile v. United Airlines Inc., 95 F.3d 492, 495 (7th Cir. 1996).

Although we realize that an employee can be at a disadvantage when it comes to the collection of information, insofar as the relevant data is in the hands of the employer, we nevertheless find no abuse of discretion here. Bilow argued that the documents relating to the firm's earnings and expenses would have helped her show that its cost justification for its staffing decision in the Brouwer case was pretextual. But the judge did require that the firm produce all records regarding the Brouwer case and the cases

that Bilow argued were most analogous to Brouwer. Any other evidence of billing and costs was irrelevant to the firm's justification for its staffing decision in the Brouwer case.

We similarly see no abuse of discretion (indeed, no error) in the court's refusal to compel production of the Ament letter. Indeed, it is hard to see how the letter is relevant to the issues in this litigation. Ament's feelings regarding women leading religious services in his synagogue tell one little or nothing about his views on the role of women in the workplace. Furthermore, it is unclear what part Ament played in the staffing and gross-up decisions. Given that Bilow failed to take a single deposition during discovery, it seems disingenuous for her now to complain that the district court did not require the firm to give her access to some marginally (at best) relevant documents.

D. Cross-Appeal: Supplemental Jurisdiction

After the district court dismissed all of the federal claims, it declined to exercise supplemental jurisdiction over the state law claims, finding that the state law claims presented "complex" and "undecided legal issues, best resolved by the Illinois state courts." See 28 U.S.C. sec. 1367. The firm has appealed from that decision, which we review for abuse of discretion. Groce v. Eli Lilly & Co., 193 F.3d 496, 499-500 (7th Cir. 1999). We recognize that the court could have chosen to decide the merits of the state law claims, had it thought the appropriate disposition of the claims was crystal clear and it was otherwise efficient to do so. See Centres, Inc. v. Town of Brookfield, 148 F.3d 699, 704 (7th Cir. 1998). This does not mean, however, that the court is required to exercise supplemental jurisdiction; to the contrary, it may decline to do so if it "has dismissed all claims over which it had original jurisdiction," as it did in this case. 28 U.S.C. sec. 1367(c)(3). See also Van Harken v. City of Chicago, 103 F.3d 1346, 1354 (7th Cir. 1997).

Bilow's state claims would have required the court to undertake a complex analysis of the salary and bonus structure of the

firm and the interplay between the firm's system and various state common law and statutory rules. See Centres, 148 F.3d at 704 ("[C]ases involving difficult and unresolved issues of state law . . . may well be adjudicated more accurately and more expeditiously in a state court."). There was little enough overlap between these issues and the ones the court had already considered for the federal claims to make its decision to dismiss a perfectly sensible one--easily one within its discretion.

## III

Whatever problems Bilow had with the firm--perhaps a lack of sensitivity to the problems of working mothers, perhaps bad communication about staffing decisions--we agree with the district court that she did not state a claim under any section of ERISA, nor did she present a Title VII claim that was entitled to go to trial. We therefore Affirm the district court's judgment on her federal claims and its dismissal of the supplemental state claims. Finally, we see no error or abuse of discretion in the district court's judgment of costs in favor of the defendant, which we also Affirm.

## FOOTNOTE

/1 We are not sure why Bilow believes the problem began in 1986. The gross-up did not begin to be phased out until 1992 at the earliest.