In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 07-2021

JERILYN A. LUCAS,

*Plaintiff-Appellant,*

*v.*

PYRAMAX BANK, FSB,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05-C-888—**Rudolph T. Randa**, *Chief Judge.*

_____

ARGUED FEBRUARY 12, 2008—DECIDED AUGUST 22, 2008

_____

Before EASTERBROOK, *Chief Judge*, and RIPPLE and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Jerilyn Lucas claims that her former employer, PyraMax Bank, demoted and ultimately fired her because of her gender in violation of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e to 2000e-17. Lucas also contends that PyraMax retaliated against her in violation of Title VII, *see id.* § 2000e-3(a), and that it

took adverse employment actions against her because she exercised her rights under the Family and Medical Leave Act of 1993 (FMLA), *see* 29 U.S.C. § 2601 *et seq.*, and the Employment Retirement Income Security Act of 1974 (ERISA), *see* 29 U.S.C. § 1001 *et seq.* The district court granted summary judgment in favor of PyraMax, and for the reasons that follow, we affirm.

## I. Background

In February 2003, Lucas applied for the position of branch executive officer ("BEO") at PyraMax's Greenfield office. Lucas had at least fourteen years' experience in marketing and sales, consumer lending, collections, risk management, and human resources at the time she applied, but she had no prior experience as a BEO of a bank and had not previously been responsible for the operational functions of a lending institution. Lucas was interviewed by Monica Baker, Senior Vice-President of Human Resources, who then forwarded her application to Karen Murphy, Senior Vice-President of Retail Banking. Murphy eventually offered the position to Lucas, and she started working as Greenfield's BEO in March 2003.

Soon after Lucas started, Murphy warned her about the "personnel issues" at the branch. Murphy described the staff as immature and informed Lucas that she would have her "hands full" reinstating order. Murphy also told Lucas about PyraMax's flex-time policy, which gave employees some flexibility in their work schedules, provided that at least one member of management was on duty at all times. Lucas had no performance problems when she started; in

fact, early on Murphy told Lucas that she was a "great addition to the PyraMax Bank team." But at the same time, Murphy felt that Lucas needed a greater amount of supervision than other BEOs.

Lucas suffered from serious medical conditions throughout her employment at PyraMax. During her first month on the job, she had a kidney stone, and then the next month she suffered from an unspecified "chronic and at times debilitating illness" that required repeated treatment. Despite her absences from work, at that time Lucas's performance did not suffer. In her first 90-day performance evaluation dated June 10, 2003, Lucas was rated as either "outstanding" or "effective" in all categories, although she was told to increase her knowledge of operations within the next two months.

In August 2003, Murphy began receiving complaints about Lucas. Members of Greenfield's staff told Murphy that Lucas did not understand the operational aspects of banking, such as balancing the bank totals and determining where errors occurred in various transactions, and that she was often not available to answer questions. And according to Denise Walkowiak, a BEO at another branch, Lucas would frequently call her with questions about basic operational issues. Lucas also told Walkowiak that she regularly came to work late and left early, and Lucas admitted that, on average, she worked about 20 fewer hours per week than did Walkowiak. In October 2003 a branch receptionist told Murphy that Lucas's frequent absences and her inability to answer work-related questions had become the subject of conversation among

members of the Greenfield staff. The receptionist informed Murphy that members of the staff saw Lucas as unfamiliar with operational duties and generally unapproachable. Murphy noted some of these concerns in Lucas's semi-annual review, in which she gave Lucas ratings of "2" out of "5" in the areas of staff performance management, branch client services, and internal client services. But Lucas excelled in sales, and during her tenure, Greenfield enjoyed the highest sales of any PyraMax branch.

Unfortunately, Lucas's medical problems continued. In late October 2003, while at work, Lucas experienced stroke-like symptoms, and Murphy had to take her to the emergency room. Lucas underwent a brain scan, which revealed some abnormalities that required further testing. Lucas shared these results with Murphy, and Murphy told her that "news like this is the kiss of death in most employers' eyes." The following month, Lucas was asked to complete a medical questionnaire and return it to human resources. Lucas had filled out a medical questionnaire eight months earlier, but, according to PyraMax, the bank was transitioning to a self-funded health insurance program and needed to supplement its records. PyraMax also required Lucas to sign an authorization for release of her medical records to the bank because, her doctor later told her, the bank was seeking a "stop loss" insurance policy to protect itself in case the cost of an individual employee's health care exceeded a certain amount.

In December 2003 Lucas hired Jessica Overmyer as an assistant BEO. Overmyer had started out at a different branch within the bank and had performed well at that

branch. That same month, Murphy hired Robert Cooper, who had 15 years' experience as a BEO, as a management trainee. Lucas took bereavement and personal time off between December 19, 2003, and January 19, 2004, and Cooper served as BEO during this and other of Lucas's absences. According to Murphy, members of Greenfield's staff responded well to Cooper and his positive attitude helped improve employee morale. Cooper also was said to have an "excellent attendance record, 17 years with never having called in sick."

In May 2004, a little over a year after her start with PyraMax, Murphy informed Lucas of the current problems with Lucas's job performance. Murphy told Lucas that she had a poor work attitude and that members of the staff had "picked up on" her negativity. Lucas had engaged in at least one public confrontation with a senior staff member,[1] and Murphy informed her that her behavior (both in that instance and generally) was unprofessional. Additionally, despite Murphy's earlier admonishments, Lucas still did not possess the required operations and personnel-management skills. According to Murphy, Lucas needed more supervision and advice about her responsibilities than all other BEOs combined. Murphy

---

[1] The incident involved Consumer Lending Manager Eric Halling, who, together with Murphy, played an April Fool's Joke on the staff by imposing an unreasonable demand (no details are given as to the nature of this "demand") in a fictional new sales contest. We credit Lucas's version of the event, in which she criticized Halling in front of others, but did so because she was defending her staff before they learned about the joke.

also voiced concern over Lucas's frequent, unexcused absences.

In June 2004, after at least three employees had sought to transfer out of Greenfield, Murphy met with Overmyer to discuss the direction of the branch. Murphy noted that Overmyer's performance and attitude had drastically worsened since her arrival at Greenfield, and Overmyer explained that she was overwhelmed by the amount of work that was now required. According to Overmyer, because Lucas was frequently out of the office and, even when she was there, was not able to answer operational questions, Overmyer essentially had to do both her own job and Lucas's. Murphy then met with three other staff members, two of whom confirmed that it was difficult to get Lucas to answer questions and that she lacked operations knowledge. Those same two employees also stated, however, that Overmyer was too harsh with them. From these meetings, Murphy concluded that Lucas's behavior was causing "an impending mass exodus of employees from the Greenfield branch." Murphy discussed the situation with Baker, and the two agreed that Lucas should be removed from her position as BEO. But, because Lucas was skilled in sales, they determined that rather than fire her, they would demote her to a "floating BEO trainee" position, where she was to undergo training to improve her operational skills. Cooper replaced her as BEO.

Lucas accepted the new position and began training on June 21, 2004. But she had to go on leave the next day because her demotion had exacerbated an existing

anxiety and panic disorder. Lucas did not return to work until almost two months later. But in July 2004, while she was on leave, Lucas filed a complaint with the Equal Rights Division of Wisconsin's Department of Workforce Development, alleging gender discrimination and retaliation. Lucas's training resumed once she returned to work, but in early October, Lucas was diagnosed with a genetic sensory conflict condition, which left her unable to complete most of the training. Despite her condition, Lucas withdrew from PyraMax's health insurance plan, effective December 1, 2004, because, Lucas asserts, she thought her job was in jeopardy and she decided to secure other coverage. Lucas was transferred to a different branch and by December 2004, staff members at that branch began to complain about her performance. On December 10, Murphy terminated Lucas.

## II. Analysis

On appeal Lucas first contends that the district court improperly granted summary judgment on her claim that she was demoted and later fired because of her gender. We review the district court's grant of summary judgment de novo, and we construe all reasonable inferences in Lucas's favor. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 786 (7th Cir. 2008); *Metzger v. Ill. State Police*, 519 F.3d 677, 680 (7th Cir. 2008). Lucas relies on the indirect method of proof articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), under which she had to show that: (1) she is a member of a protected class, (2) she met her employer's legitimate job expectations, (3) she

suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment. *See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687 (7th Cir. 2007); *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 772 (7th Cir. 2006).

In this case, Lucas has not presented sufficient evidence to show that she was meeting PyraMax's legitimate job expectations. Although she was strong in sales and well-received when she first started, Lucas later became unapproachable, was unable to answer the job-related questions from her staff, and, compared to other BEOs, was unproductive. Consequently, as Murphy repeatedly warned her, Lucas eventually fell far short of PyraMax's expectations. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328-29 (7th Cir. 2002) (concluding that employee whose job performance was repeatedly criticized was not meeting employer's legitimate job expectations, despite evidence that, at one point, employee had received positive performance reviews); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993) (noting that central issue is whether employee was performing well in her job at time of her firing). In addition, Murphy believed that Lucas was responsible for "an impending mass exodus" of workers from the branch. Although Lucas has presented some evidence that Overmyer may also have been part of the problem at the Greenfield branch, at the most she has established that it may have been bad business judgment for Murphy to attribute the problems entirely to her. None of her evidence calls into question Murphy's genuine belief that Lucas was

the cause of the "exodus" from the branch. And although Murphy told her on several occasions that her operational skills were lacking, Lucas never became proficient in operations, and those skills—not just sales—were a significant part of her job. *Cf. Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004).

Lucas also cannot show that a similarly situated male employee received better treatment than she did. We have noted that a coworker must possess a "comparable set of failings" to be similarly situated to the fired employee. *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (internal quotation marks and citation omitted). Lucas compares herself to Cooper, but he is not similarly situated because he had a functioning working relationship with members of the staff and also had better developed operational skills than she did.

Next, Lucas contends that PyraMax retaliated against her for filing a complaint with Wisconsin's Equal Rights Division. Lucas proceeds under the direct method of proof; therefore, she had to show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse action taken by the employer, and (3) there was a causal connection between the two. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 408 (7th Cir. 2008); *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007). In this case, Lucas was demoted *before* she complained of gender discrimination, and thus, this action could not have been retaliatory. With regard to her firing, there is also no evidence that her gender-discrimination complaint caused the discharge. At the time that she complained, Lucas had already

received several warnings that her job performance was unsatisfactory. Although PyraMax demoted her to give her a chance to improve her operational (and other) skills, her performance record establishes that she had not done so by the time she was fired. As such, nothing in the record supports Lucas's contention that PyraMax fired her because she complained of gender discrimination.

Lucas also claims that PyraMax demoted and then discharged her for exercising her rights under the FMLA. The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the Act. *See* 29 U.S.C. § 2615(a)(2); *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). To survive a motion for summary judgment on her claim of retaliation under the FMLA, Lucas had to submit evidence showing that PyraMax demoted or fired her because she took valid leave. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 616 (7th Cir. 2001). But, as we have noted, "employers may fire employees for poor performance if they would have fired them for their performance regardless of their having taken leave." *Ogborn v. United Food and Commercial Workers Union, Local No. 881*, 305 F.3d 763, 768 (7th Cir. 2002); *see also Phelan v. City of Chicago*, 347 F.3d 679, 682-83 (7th Cir. 2006). Here the evidence shows that Lucas was not adequately performing her job and that her behavior was undermining the branch. We recognize that Lucas highlights some rather unfortunate remarks made by PyraMax, such as Murphy's comment that news about her poor health was the "kiss of death" for most employees. But none of these comments were made

contemporaneously or in connection with either the demotion or discharge. Therefore, they fall in the category of "stray remarks." *See, e.g*, *Nichols v. Southern Illinois Univ.-Edwardsville*, 510 F.3d 772, 781-82 (7th Cir. 2007); *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 666-67 (7th Cir. 2007). And, as we have already observed, her inability to perform operational duties and to interact appropriately with members of the staff provided a legitimate reason for PyraMax to fire her.

Finally, Lucas argues that PyraMax fired her in violation of § 510 of ERISA to avoid paying medical benefits. Under that section, an employer cannot discharge "'a participant or beneficiary for exercising any right to which he is entitled under the provision of an employee benefit plan.'" *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 949 (7th Cir. 2008) (quoting 29 U.S.C. § 1140). To create a triable issue under § 510 using the indirect method of proof, Lucas had to show sufficient evidence that she (1) belonged to the protected class of participant or beneficiary, (2) was qualified for her position, and (3) was fired under circumstances that support her contention that PyraMax intended to deprive her of benefits. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 943 (7th Cir. 2007); *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir. 2005). Because Lucas voluntarily withdrew from PyraMax's health insurance plan before she was fired, the parties dispute whether she qualifies as a participant of its health insurance plan. The statute defines participant as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or

members of such organization." 29 U.S.C. § 1002(7). Because Lucas could have re-enrolled had she not been fired, the district court determined that she was a participant in PyraMax's health care plan.

We need not resolve this dispute, however, because Lucas cannot satisfy the second or third prongs of the test. As we discussed above, the evidence does not support Lucas's argument that she was qualified for her job when PyraMax fired her. Additionally, we have held that "an ERISA retaliation plaintiff must demonstrate that the employer had the *specific intent* to violate the statute and to interfere with an employee's ERISA rights." *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 892 (7th Cir. 2001) (emphasis in original). Here, PyraMax believed that Lucas was not a member of its plan when it terminated her, at which time PyraMax also had received several months' worth of complaints about Lucas's poor job performance. Therefore, she cannot show that PyraMax had the specific intent to deprive her of benefits by firing her.

### III. Conclusion

For these reasons, the judgment of the district court is AFFIRMED.