In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 05-3866

PETER LUKS,

*Plaintiff-Appellant,*

*v.*

BAXTER HEALTHCARE CORPORATION,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 2958—**Matthew F. Kennelly**, *Judge.*

---

ARGUED APRIL 3, 2006—DECIDED NOVEMBER 3, 2006

---

Before EASTERBROOK, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Peter Luks contends that Baxter Healthcare Corporation ("Baxter") discharged him on the basis of age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"). The district court granted summary judgment to Baxter. Luks appeals, and we affirm.

## I.

Luks began his employment with Baxter in 1982. Twenty years later, at the time of his discharge, he had attained the

position of Senior Business Systems Consultant. He was fifty-two years old when he was terminated.

In August 2000, Baxter hired John Goode as its Vice President of Architecture, Technology and Planning, and Luks began reporting to Goode. Goode prepared Luks' year-end evaluation for 2000. In the original draft of that evaluation, Goode indicated that Luks did not meet expectations in two areas. After discussing the draft with Luks, Goode revised the evaluation to indicate that Luks was meeting expectations in those areas. However, the final report was still critical of Luks in certain respects, observing for example that Luks did not provide sufficient leadership, direction and managerial support to the team of technical employees under him.

In March of the following year, Baxter hired Carol Kazl as the Director of the company's Program Office. That office was responsible for coordinating all information technology projects undertaken throughout the firm. Goode assigned Luks to work in the Program Office as a Technical Consultant under Kazl's supervision. Luks' first assignment was to develop a process by which the Program Office would evaluate and prioritize requests for information technology work and then assign those requests to a team in the Corporate Information Technology Department. Luks was well into the development of this prioritization process in late August of 2001, when Kazl gave him his mid-year evaluation. Kazl rated Luks as meeting expectations overall. She did suggest, however, that Luks needed to make more of an effort to submit his status and time reports in a timely manner, to be open to new ideas and suggestions, to follow through on the implementation of his ideas, and to more effectively discuss the prioritization process on a broader (i.e., less technically detailed) level. Kazl advised Luks that his title would change to that of Senior Business Systems Consultant at the end of the year

as he began to implement and manage the prioritization process he had been developing.

During the latter part of 2001, as Luks increasingly focused on implementation and management of the prioritization process he had developed, Kazl became dissatisfied with his performance. Kazl was concerned that the turnaround time on project requests was too great, that the database of pending information technology requests that Luks had created was not kept updated, and that Luks failed to follow through on offers of assistance. When she completed her year-end evaluation of Luks' performance, Kazl concluded that Luks was not managing the prioritization effectively and thus was not meeting expectations. Kazl identified ten specific areas in which Luks needed to improve. Kazl shared her evaluation with Goode, who agreed with her assessment.

Kazl met with Luks in January 2002 to discuss the evaluation. Luks voiced his disagreement with a number of comments in the review as well as its overall negative tone. Kazl made certain revisions to the report based on her discussion with Luks, deleting some criticisms but leaving others in place. She also drafted a set of performance objectives for the new year that she had Luks review and acknowledge. Luks subsequently complained to Goode that he believed his year-end review was inaccurate and unfair. Goode informed Luks that he would defer to Kazl's assessment. Goode gave Luks the impression that he did not need to worry about the review.

Because she had given Luks an overall rating of "does not meet expectations," Kazl placed him on a thirty-day performance improvement plan. The plan set forth certain observations about Luks' prior performance and set forth twenty-eight targets for improvement. Before she imposed the plan, Kazl consulted with Goode as well as Gretchen Nester, Baxter's Human Resources Manager, both

of whom thought that the plan was appropriate. Kazl presented the plan to Luks in late March 2002 and went through it with him. After reviewing the plan at home, Luks discussed it with Kazl a second time. Luks again expressed his disagreement with Kazl's assessment that his performance was not meeting expectations. At the conclusion of the discussion, Kazl admonished Luks that he was expected to meet the objectives of the plan within the next thirty days. Luks believed that he would be able to do so; he also understood that he was subject to termination if he did not. Luks and Kazl were to meet regularly to evaluate his progress, but it was otherwise Luks' responsibility to provide Kazl with updates.

Luks subsequently met with Goode to discuss the performance plan. Luks read Goode a prepared statement expressing his reservations regarding Kazl. Luks asked that he report directly to Goode instead of Kazl and/or that the performance plan be removed from his file. Goode denied these requests. He suggested that Luks try to comply with the plan and indicated that his performance would be reviewed in thirty days.

Although Kazl was initially encouraged with Luks' efforts to comply with the plan, at the end of the thirty-day period she concluded that Luks had not sufficiently improved his performance. Kazl believed that Luks' performance was still unacceptable in a number of respects. In fact, as she updated the performance plan to reflect what Luks had achieved, she concluded that Luks had met only nine of the twenty-eight objectives in the plan. After meeting with Nester, Kazl decided to terminate Luks. Goode subsequently reviewed the updated performance plan and concurred in Kazl's decision.

On May 2, 2002, Kazl and Nester met with Luks and advised him that Baxter was terminating his employment for failure to satisfy the requirements set forth in

the performance plan. Kazl went through the plan with Luks and discussed with him her assessment of his progress as to each of the objectives included in the plan. Luks registered his disagreement with a number of Kazl's observations.

Following Luks' departure from the company, Baxter initially posted his position as open, and two of his former co-workers, Terri Stevens and Nathan Habeck, were directed to assume his duties until the vacancy was filled. Baxter subsequently concluded that budgetary constraints precluded the company from hiring anyone to fill the position. At that point, Stevens took over the bulk of Luks' former responsibilities. The following year, organizational changes prompted Baxter to abandon the prioritization process that Luks had spearheaded.

## II.

Luks contends, contrary to the district court's conclusion, that he has presented sufficient evidence that he was discharged because of his age so as to require a trial. Our review of the district court's summary judgment is de novo. *E.g.*, *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). We are, of course, obliged to construe the admissible evidence in Luks' favor in deciding whether the record presents a question of material fact that precludes summary judgment in Baxter's favor. *Id.*

A plaintiff can establish that he is the victim of age discrimination through direct or indirect means. The distinction between the two avenues of proof is "vague," *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006), and the terms "direct" and "indirect" themselves are somewhat misleading in the present context. For, as we recently explained in *Sylvester*, "direct" proof of discrimination is not limited to near-admissions by

the employer that its decisions were based on a proscribed criterion (*e.g.*, "You're too old to work here."), but also includes circumstantial evidence which suggests discrimination albeit through a longer chain of inferences. *Id.* at 902-03; *see also Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006). The "indirect" method of proof involves a subset of circumstantial evidence (including the disparate treatment of similarly situated employees) that conforms to the prescription of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). *See Sylvester*, 453 F.3d at 902. Luks believes that he can establish age discrimination through both means.

Luks has identified two sets of facts in an effort to establish directly that he is the victim of age discrimination. The first includes a series of remarks by Goode which, in Luks' view, evince a desire to rid Goode's department of its oldest employees, including Luks. The second is a series of circumstances that, as Luks interprets them, suggest a plan by Goode to make his wish a reality. We begin with the second set of circumstances.

Luks cites a series of events, remarks, and documents which Luks believes amount to what the cases describe as a "mosaic" of facts bespeaking age discrimination. *See id.* at 903 (collecting cases). As *Sylvester* clarified, evidence of this sort need not necessarily take the form of a convincingly rich mosaic; it is enough that the circumstances give rise to a reasonable and straightforward inference that the employer has relied on a proscribed factor in taking action against the employee. *Id.* at 904; *see also Ptasznik*, 464 F.3d at 695. Luks relies on the following evidence to create this mosaic.

*First*, Cynthia Overby, Manager of Web Services, had a meeting with Goode in late 2001 or early 2002 in which Goode expressed dissatisfaction with the performance of Glen Jurmann and Larry Helsith, both of whom reported

to her. Overby herself was satisfied with the work of both men and told Goode so. Nonetheless, Goode subsequently directed Overby to put Helsith and then Jurmann on performance plans. Overby disagreed with the need for such plans. When she told Goode that she did not believe that a plan for Jurmann was necessary (she believed his performance was excellent), Goode told her that if she was unwilling to implement such a plan, she should find a position for Jurmann elsewhere in the company; Overby later succeeded in having Jurmann transferred to a different department. Overby did implement a plan for Helsith (whose work she regarded as above average) in consultation with both Goode and Nester but became convinced that they were intent on fabricating a reason for Helsith's discharge. In an effort to prevent that from happening, Overby provided Nester with performance appraisals documenting Helsith's satisfactory performance. When Goode found out what Overby had done, he fired her. Helsith was subsequently terminated as part of a reduction in force.

*Second*, there are three documents which, in Luks' view, bespeak a plan to get rid of Helsith, Jurmann, and himself. Overby testified that when she met with Goode in late 2001 or early 2002 and he expressed his dissatisfaction with Helsith and Jurmann, she happened to observe that Goode had a sheet of paper in his notebook which had not only their names but Luks' name written on it. (Overby could not recall what else was written on the paper.) Next, not long after Kazl became Luks' supervisor, she discovered some sort of blank performance plan in Luks' personnel file that appeared to envision certain action vis-à-vis Luks' employment; the plan had the names of Helsith, Jurmann, and Luks written on it. Kazl mentioned the document to Nester and showed it to Luks; neither of them knew anything about it. When Luks himself reviewed his personnel file days later, the document was no longer there. Finally, a blank "Performance Objective Template" produced by

Baxter in discovery likewise bore the names of Luks, Helsith, and Jurmann. A handwritten note at the bottom of the template, dated February 8, 2001, reflects a meeting between Goode and someone else concerning efforts to document Luks' performance. It was around this same time that Goode began keeping a log of "various issues" involving Luks. Goode Dep. 214.

*Third*, Luks contends that the criticisms included in his 2001 year-end review, the observation items that were later incorporated into his performance plan, and the reasons given for his termination either were factually inaccurate, failed to comprehend Luks' role in the Program Management Office, or were unsupported with examples. Luks adds that Kazl was unreceptive to a dialogue about the accuracy of these criticisms, as was Goode. To Luks' mind, Kazl, consistent with Goode's wish to get rid of him, was simply fabricating a list of reasons to justify his discharge. Luks points out that Overby had the same impression. Overby testified that she had discussed Luks' performance improvement plan with Kazl, who came to her for guidance knowing that Overby had been asked to put together similar plans for Helsith and Jurmann. According to Overby, Kazl was not quite sure how to proceed with the plan, was "extremely frustrated" by the task, and was not quite sure what "they" wanted. Overby Dep. 41, 44-45. Overby herself had worked with Luks and had a favorable impression of his skills. Overby surmised that Luks, like Helsith and Jurmann, was being set up for discharge.

We may assume for the sake of argument that these bits of evidence, individually and collectively, are consistent with there being a wish and a plan by Goode to get rid of Luks along with Helsith and Jurmann irrespective of their actual performance. The factfinder arguably could infer from the testimony of Overby, as Helsith's and Jurmann's immediate supervisor, that they were being targeted for termination for reasons unrelated to their performance. The

inference is somewhat less plausible as to Luks, in that it depends largely on his own subjective assessment (with a second from Overby and certain of his co-workers) that his performance was adequate. We shall have more to say about that below with respect to pretext, but we will put that aside for now. The documents, which mention Luks as well as Helsith and Jurmann and which appear to have predated the implementation of any of the performance plans, likewise could be seen as being consistent with a preconceived plan to get rid of all three employees.

But, as the district court reasoned, nothing in this mosaic of evidence supports the inference that Goode's apparent wish to terminate these three employees was motivated by their age. Luks does point out that the three of them were the oldest employees in Goode's chain of command. That fact is certainly consistent with age being the reason why Goode may have singled them out, but it does not affirmatively suggest that Goode was seeking to oust them *because of* their age.

Luks has, however, identified a separate collection of facts that he believes support this very inference. These include a series of remarks related to age that, in Luks' view, indicate that Goode was averse to older employees like Luks.

*First*, in the course of discussions between Goode and Overby regarding the implementation of performance plans for Helsith and Jurmann, Goode remarked at one point that he wanted to get rid of the "good old boys" and bring an end to the "good old boys club." *See* Overby Dep. 20-21. (According to Baxter, Goode made those remarks not during a discussion of Helsith and Jurmann, but rather in reference to individuals on a technical leadership team who had been with the company for long periods of time. But we accept Luks' construction as accurate for present purposes.) Goode also indicated to Overby that he was looking for "higher energy" employees. Overby Dep. 23.

*Second*, Human Resources Manager Nester reported complaints from both Jurmann and Helsith that Goode was "disrespectful" and "lacked professionalism" in his interactions with people and more specifically that he had made remarks to them about "old timers." Nester Dep. 46-47, 52. Helsith had indicated to Nester that Goode used that term in reference to long-time Baxter employees.

*Third*, in April or May 2002, around the time of Luks' termination, Goode introduced Luks to a new secretary at Baxter as "the old guy in the department." Luks Dep. 235-36.

Ultimately, none of these remarks supports the inference that Luks was discharged because of his age. With respect to the "good old boy" references, we have previously held that a nearly identical remark, uttered by another Baxter employee, was not evidence of age discrimination. *Lindsey v. Baxter Healthcare Corp.*, 962 F.2d 586, 588 (7th Cir. 1992) ("No weight can be attached to an overheard comment that Baxter does not like to promote 'good old boys,' since any competent user of the English (or rather the American) language knows that to be a good old boy one need not be old, or for that matter good."). Goode's expressed interest in "higher energy" employees, although potentially consistent with age discrimination, is not by itself direct evidence of such discrimination. *E.g.*, *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998); *Svenson v. William Wrigley, Jr. Co.*, No. 95 C 4198, 1996 WL 705250, at *4-*5 (N.D. Ill. Nov. 27, 1996) (Williams, J.). Nester's testimony as to what Helsith and Jurmann told her about Goode's remarks amounts to inadmissible hearsay, as the district court reasoned. Luks has made no effort to surmount that problem. Finally, Goode's reference to Luks as the "old guy in the department," even if construed as a reference to his age rather than his tenure, does not suggest that age was a factor in the decision to fire Luks. Beyond the fact that the remark (which Luks admits was "kind of

a joke," Luks Dep. 237) was made close in time to Luks' discharge, nothing links Goode's remark to Baxter's decision to let Luks go. Indeed, the record indicates that it was Kazl, not Goode, who made the decision to fire Luks. It was Kazl who concluded at the end of 2001 that Luks' performance was unsatisfactory, who then drafted a performance plan for Luks, and who concluded ultimately that Luks should be terminated for failing to achieve the objectives of that plan. Goode, it is true, approved Kazl's decisions at each step of this process and testified that he "coached" her in the implementation of the performance plan to ensure that she was taking the correct steps procedurally. Goode Dep. 58. But the record does not support the inference that Goode had any role in the events culminating in Luks' termination other than signing off on and supporting Kazl's independent decisions. In short, there is no evidence that Goode's dislike of older workers, if that is what his remarks reveal, played any role in Luks' termination.

Luks is left with trying to establish discrimination under the *McDonnell Douglas* framework. Under that framework, Luks must first establish a prima facie case of discrimination by showing, among other things, that he was meeting Baxter's legitimate performance expectations. Assuming that Luks makes out a prima facie case, Baxter must then articulate a legitimate, nondiscriminatory reason for his discharge. Luks is then obliged to establish that the reason articulated for his discharge is pretextual. The district court proceeded directly to the subject of pretext, assuming that Luks had made a prima facie showing of discrimination and that Baxter had articulated nondiscriminatory reasons for Luks' termination. We shall do the same.

As noted above, Luks contends that the criticisms cited in his adverse year-end review for 2001 and the ensuing performance plan were inaccurate and/or unfounded. He adds that we should not credit Kazl's testimony that he ultimately failed to meet the goals of the performance plan,

because Kazl acknowledged that Luks showed significant improvement during the first two weeks of the thirty-day period but was largely out of the office for the rest of that period. Moreover, two of the co-workers who worked most closely with Luks during the year preceding his termination, Stevens and Habeck, testified that they were unaware of any issues with Luks' performance and believed that he was doing a good job. Habeck, it turns out, shared responsibility with Luks for certain aspects of the prioritization process (for example, keeping the database of pending project requests updated), yet unlike Luks Habeck was never criticized by Kazl for the shortcomings she perceived in those areas. And like Luks, Habeck and also Stevens were expected to give Kazl weekly updates on their job responsibilities. Both Stevens and Habeck said that they occasionally failed to provide Kazl with those reports, yet neither was ever rated negatively by Kazl for those failures.

The problem is that none of this suffices to establish pretext. Luks' own opinion that he was doing the job satisfactorily is beside the point. *See*, *e.g.*, *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 985 (7th Cir. 1999). His assertions as to purely factual matters within his personal knowledge might establish questions of fact on those points, *Payne v. Pauley*, *supra*, 337 F.3d at 771-73, but the relevant question is not whether the criticisms of his performance were right or wrong but whether his supervisor honestly believed them. *E.g.*, *Gusewelle v. City of Wood River*, 374 F.3d 569, 576 (7th Cir. 2004). At most, Luks' disagreement with the criticisms levied against him, coupled with the purported unwillingness of either Kazl or Goode to discuss his disagreement, shows that Kazl may have been mistaken in her assessment and that both she and Goode were bull-headed in their refusal to consider that possibility; but it does not show that Kazl was untruthful in her negative evaluation of Luks. The fact that Kazl thought he was doing well on the performance plan initially

does not undercut her ultimate conclusion that he did not meet all of the plan's objectives. Kazl herself agreed at end of the thirty-day period that Luks had met some of the objectives but believed that he had failed to achieve others. The fact that she was not in the office for a portion of the thirty-day period does not call into question the honesty of that conclusion. Finally, the fact that Luks' coworkers thought he was doing a good job is beside the point. They were not charged with the responsibility of monitoring and evaluating Luks' work performance; Kazl was.

Potentially more relevant is the evidence that two of the people who worked with Luks—Habeck and Stevens— were not evaluated negatively despite the fact that Habeck's duties overlapped with those of Luks on aspects of the prioritization process that Kazl found wanting and that Habeck and Stevens both engaged in conduct (namely, failing to submit weekly reports) for which Kazl criticized Luks. Given that Habeck and Stevens worked in the same department as Luks and reported to Kazl, the disparate treatment might call into question the reasons Kazl gave for concluding that Luks was not performing up to snuff. Still, there are two problems with this evidence. First, Luks was the individual responsible for the development and implementation of the prioritization process, and Kazl arguably would be entitled to hold Luks to a higher standard of conduct based on his leadership position. That point aside, the testimony of Habeck and Stevens calls into question some but not all of the grounds on which Kazl concluded that Luks was not meeting expectations. As such, the evidence does not support the inference that the overall basis for Luks' discharge was pretextual. *See Wolf v. Buss (America) Inc.*, 77 F.3d 914, 920 (7th Cir. 1996).

Even if we take into account the other circumstantial evidence that Luks has cited as direct evidence of discrimination, including in particular the evidence suggesting that Goode had a wish to get rid of Luks, the case for pretext

still comes up short. The evidence of record indicates that it was Kazl, not Goode, who found Luks' performance wanting and who ultimately made the decision to fire him. Goode, as we have said, supported Kazl but (so far as the evidence reveals) did not direct or urge her to make that decision. To the extent one can infer that Goode had an intent to terminate Luks irrespective of his work performance, there is no evidence that Kazl was a party to that plan and concocted false criticisms of Luks' work in an effort to carry the plan out.

## III.

We AFFIRM the entry of summary judgment against Luks and in favor of Baxter.

A true Copy:

       Teste:

                      _____

                      *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*