In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3855

ROBERT A. HENRY,

*Plaintiff-Appellant*,

*v.*

ARTHUR L. JONES and CITY OF MILWAUKEE,

*Defendants-Appellee*s.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 C 1082—**J.P. Stadtmueller**, *Judge.*

ARGUED APRIL 9, 2007—DECIDED NOVEMBER 1, 2007

Before EASTERBROOK, *Chief Judge*, and KANNE and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* After a local television station aired a videotape that showed Officer Robert Henry shoving an unarmed arrestee in a police station booking room and then pushing him against a wall and onto a desk, then-Milwaukee Police Chief Arthur Jones requested an Internal Affairs Division investigation and ultimately decided to terminate Henry from the Milwaukee Police Department. Henry, a white male, maintains that Jones, an African American, fired him because of Henry's race. However, because Henry has not presented sufficient evidence that the decision to terminate him was made on

account of his race, we affirm the district court's grant of summary judgment in favor of the defendants.

## I. BACKGROUND

Robert Henry filed this suit against the City of Milwaukee and Arthur L. Jones, the chief of police of the City of Milwaukee from November 18, 1996 to November 18, 2003. We recount the facts that follow in the light most favorable to Henry, the nonmovant for summary judgment. On March 20, 2002, Milwaukee police officers Talmer Wilson and Rodney Young, both African-American males, arrested Billy Miles, also an African-American male. The officers brought Miles to the police station where Henry was working. A video camera located in the booking room recorded the events at the heart of this suit. The videotape contains a date and time display, but it did not record sound.

Accompanied by an officer, Miles entered the booking room at 2:43 a.m. and sat on a bench while Henry searched another person. About seven minutes later, the officer accompanied Miles to the area in front of Henry's desk. Miles removed his coat, and the officer briefly searched him. Miles remained standing in the area to which he had been brought, a few feet in front of the desk where Henry was seated. During this time, Henry sat at his desk completing paperwork while two other officers (presumably Wilson and Young) stood nearby. Although there is no sound on the video, it is clear that Miles spoke to the three officers while he stood in front of Henry's desk, and he occasionally gestured while doing so.

At 2:54 a.m., Miles gestured towards Henry and briefly placed his hands on Henry's desk. This action did not produce any reaction from the three officers, and Henry remained seated at his desk while the other two officers

remained standing, one leaning on a counter. Miles took a few steps back to where he had been standing and continued to talk to the officers. At 2:55 a.m., Henry stood up from his chair and walked around his desk, toward where Miles was standing. Miles remained as he had been, standing with his hands at his sides. He did not move toward Henry.

While Miles's hands were both down at his sides, Henry suddenly pushed Miles in the collar bone area. This action knocked Miles off balance (Henry is taller and bigger than Miles), and he stumbled backwards. Miles regained his balance, and, with both hands raised above his head, he appeared to move toward Henry. At that point, Henry grabbed Miles near his jaw and pushed him against a wall, then onto a desk. Several persons then entered the room, and Miles was led back to the bench in handcuffs. After Miles had been handcuffed, Henry flexed his right arm and patted his bicep several times while staring at Miles. A little later, Miles spit at one of the officers. Miles was subsequently charged with assault by a prisoner for spitting at an officer.

On July 16, 2002, a Milwaukee television station aired portions of the videotape from Miles's booking. That night, Jones telephoned Internal Affairs Division ("IAD") Commander Steven Settinsgaard and asked for an investigation into Henry's actions. Settinsgaard watched the video and briefed Jones on his observations. The two decided not to take disciplinary action at that point, preferring instead to have the persons involved interviewed. Settinsgaard ordered an IAD investigation, and Jones asked the Milwaukee County District Attorney's office to investigate Henry's conduct.

The news segment showing the videotape did not go unnoticed. On July 22, 2002, about a week after the television station aired the video, members of the Wiscon-

sin Legislative Black and Hispanic Caucus wrote Jones a letter stating that the Caucus would be monitoring the police department's response. Five days later, Jones attended a community meeting where citizens expressed concern that Henry had mistreated Miles.

In the meantime, Sergeant Michelle Graham oversaw the IAD investigation, which included interviews of Henry, Miles, Wilson, Young, and others. Graham submitted a final report on August 1, 2002. Among other things, the report states that Henry explained that Miles had been uncooperative and belligerent and had threatened to spit at him. Henry further stated that he proceeded around the desk in an attempt to search Miles, and that Miles had said "Come on" while hawking something from his throat, leading Henry to push Miles against the wall to stun him and to stop his actions. In addition to conducting numerous interviews, Graham viewed the video before preparing her report. The report states that although Henry said during an interview that Miles had balled up his fist as though he would attack Henry, the video recording did not show Miles ball up his fist at any time before Henry pushed Miles. The report concluded that the video showed Henry push Miles at the base of his neck and collarbone area, causing him to fall against a wall, and that Miles had not leaned toward Henry, rolled his shoulders upward, or balled his hands before Henry contacted him. The report also finds that after Miles was restrained, Henry rolled his sleeves, flexed his bicep, and patted his bicep in a taunting manner while staring at Miles.

At the end of the IAD investigation, Settinsgaard concluded that Henry had violated a department rule regarding the treatment of prisoners by initiating physical contact with Miles by either pushing or striking him, and then by patting his bicep afterward. He

also viewed the patting of the bicep as improper taunting of a prisoner.

Henry was charged with violating a Milwaukee Police Department rule that states:

> Members of the police force are strictly forbidden to argue with prisoners, to speak to them unnecessarily, to address them in obscene or profane language, or to threaten them. Members of the police force guilty of unnecessarily striking or manhandling a prisoner or mistreating them in any manner shall be subject to dismissal . . . .

Rule 4, Section 2/455.00. Officers Wilson and Young were charged with witnessing Henry's mistreatment of Miles and failing to report it to a supervisor, a violation of another department rule.

Ten days later, Jones terminated Henry's employment (subject to appeal). He reached this decision after reviewing the videotape of Miles's booking, reading the IAD report, and receiving Settinsgaard's interpretation of the tape. In Jones's opinion, Henry violated a department rule by unnecessarily manhandling and mistreating Miles, as well as by threatening him, and he concluded that termination was appropriate. Wilson and Young received thirty-day suspensions without pay for witnessing Henry's conduct and failing to report it.

The next month, the District Attorney announced he would not issue criminal charges against Henry. A Milwaukee Police Department report states that a Deputy District Attorney explained that his office had the videotape professionally blown up and digitized. After reviewing the tape in slow motion, frame by frame, the Deputy District Attorney concluded that Henry had not placed his hands around Miles's neck but instead had his hands around Miles's chin, directing Miles's face away

from him. The report does not state whether the conduct it describes refers to the initial shove or to Henry's subsequent hold while he led Miles onto a desk. The report also states that the Deputy District Attorney believed that the video showed Miles take a defensive stance with his right fist clenched when Henry walked around the table.

Henry appealed his termination to the Board of Fire and Police Commissioners of the City of Milwaukee, and several persons testified on his behalf. Wilson and Young testified that before Henry initiated contact with Miles, they believed Miles was about to spit on Henry and that Miles did not turn to the wall as Henry had instructed. Other witnesses, including the author of a training manual for a Defense and Arrest Tactics course, testified that they had watched the video and observed nothing improper in Henry's behavior. Lieutenant Jay Martyka, an instructor at the Police Academy, testified that Henry's bicep flex could be a form of "verbal judo," a communication tool taught at the Academy. The only evidence that Jones presented in support of Henry's termination was the videotape.

The Board found that Jones had failed to present any testimony and had failed to present other evidence sufficient to sustain the chief's finding that Henry mistreated, manhandled, or threatened Miles. The Board also concluded that the chief had failed to present sufficient evidence that a fair and reasonable effort had been made to determine whether a rule had been violated. Henry was subsequently reinstated. Soon thereafter, Jones issued a press release stating that he had asked the Federal Bureau of Investigation to investigate whether Henry's actions violated federal civil rights statutes. The United States Department of Justice ultimately found no evidence of a prosecutable civil rights violation. Henry took disability leave soon after seeing the press release announcing that the matter had been referred to the FBI.

His brief states that he remains on disability with Post-Traumatic Stress Disorder.

## II.  ANALYSIS

We review the district court's grant of summary judgment de novo. *Perez v. Illinois*, 488 F.3d 773, 776 (7th Cir. 2007). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We draw all reasonable inferences from the evidence in the light most favorable to the non-moving party. *Perez*, 488 F.3d at 776.

Robert Henry contends that he was terminated from his position as an officer with the Milwaukee Police Department because he is white. Title VII prohibits employers from discriminating against employees on the basis of race, 42 U.S.C. § 2000e-2(a)(1), and it is well-settled that the protections of Title VII "are not limited to members of historically discriminated-against groups." *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005). As in any Title VII case, Henry may proceed under either the "direct" or "indirect" methods of proving discrimination. *See id.*

### A.  Indirect Method

We turn first to Henry's argument that he presented a prima facie case of discrimination under the indirect, burden-shifting method initially set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of racial discrimination in a reverse discrimination suit such as this one, the plaintiff bears the

burden of establishing: (1) "'background circumstances' that demonstrate that a particular employer has 'reason or inclination to discriminate invidiously against whites' or evidence that 'there is something "fishy" about the facts at hand'"; (2) he was performing his job up to his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly-situated individuals who are not members of the protected class. *Phelan v. City of Chicago*, 347 F.3d 679, 684-85 (7th Cir. 2003) (quoting *Mills v. Health Care Service Corp.*, 171 F.3d 450, 457 (7th Cir. 1999)) (quoting *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993)). Summary judgment in the defendant's favor is proper if a plaintiff fails to set forth a prima facie case. *See Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). If the plaintiff satisfies his initial burden, the burden shifts to the defendant to present a legitimate, non-discriminatory reason for the decision. *Id.* If the defendant does so, the burden returns to the plaintiff to show that the defendant's explanation was pretextual. *Id.*

The district court concluded that summary judgment was proper because Henry had not demonstrated that he was treated less favorably than similarly-situated employees who are not white, and it is with that conclusion that we begin. Concerned with overly rigid treatment of the indirect method's fourth prong, we have explained that "similarly situated" means only that members of the comparison group are comparable to the plaintiff "in all *material* respects." *Crawford v. Indiana Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006). That is, the inquiry asks only whether "members of the comparison group are sufficiently comparable to [the plaintiff] to suggest that [the plaintiff] was singled out for worse treatment." *Id.* The similarly situated inquiry is a flexible, common-sense one that asks, at bottom, whether "there are enough common factors . . . to allow for a meaningful comparison

in order to divine whether intentional discrimination was at play." *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007).

We agree that Henry failed to introduce evidence that he was treated less favorably than similarly-situated officers who were not white. Although Henry points to several African-American police officers whose discipline fell short of termination, none are sufficiently comparable to suggest that Henry was singled out for harsher treatment. First, Henry turns our attention to Officers Wilson and Young, the two African-American officers involved in Miles's arrest and booking. Miles stated during an IAD investigation interview that on the night he was booked, Young elbowed him in the nose and Wilson punched him in the head. If substantiated, then the officers' continued employment might give rise to an inference that the defendants treated Henry less favorably than comparable non-white officers. But here, the decision not to discipline the two officers based on Miles's story does not suggest that Henry was terminated because he is white. Wilson and Young both adamantly deny striking Miles, and, significantly, there is no corroboration whatsoever to support Miles's story that Wilson and Young inappropriately struck him. No other person supported the story, and there is no medical or other evidence consistent with Miles's account—Miles's story stands alone.

Henry's conduct, however, was captured on videotape and shown on the evening news. The tape shows Henry suddenly pushing Miles while Miles has his arms at his sides and then shoving him against a wall and onto a desk. Moreover, the video shown on the news, which had been trained on Henry and Miles for several minutes before Henry grabbed Miles, does not evidence any physical provocation on Miles's part. Instead, Miles stood with his arms at his sides, a few feet in front of Henry's desk, and, as the IAD report found, he did not make any move-

ment toward Henry before Henry pushed him. The presence of a tape suggesting that an officer used force against an arrested person without provocation can present a far different call for discipline than an unsupported story of excessive force by two officers. Moreover, Henry acknowledges that Jones was motivated by the negative publicity surrounding the incident, and only Henry's actions were shown on television. As a result, the defendants' decision to suspend Officers Wilson and Young for thirty days for failing to report Henry's treatment of Miles does not give rise to an inference of racial discrimination.

Henry also points to Officer Allen Perry, another African-American officer. Officer Perry drew a "smiley face" on a prisoner in a hospital and received a one-day suspension. Drawing on a prisoner, although a form of misconduct under the police department's rules, is simply not comparable to the sudden force Henry used on Miles. Next, Henry cites Officer Michael Rousseau, who received a one-day suspension for failing to report his use of force. Notably, although the IAD investigated both Rousseau and Henry for using excessive force against a prisoner, the IAD concluded that Rousseau's use of force was appropriate, and Jones was justified in treating Rousseau and Henry differently based on the different conclusions reached after the IAD investigations. Finally, Henry points to Officer Willie Murphy. After Murphy was struck by a car and dragged down the street, he discharged a firearm at the vehicle after it was moving away and received a ten-day suspension (reduced to five days on appeal). Although discharging the firearm also apparently violated a departmental rule, physical force had been used against Officer Murphy before he acted. Before Henry struck Miles, in contrast, no force had been used against him, nor had any movement been made toward him. In sum, none of the officers to whom

Henry points mistreated arrestees under circumstances comparable to those here.

For similar reasons, our recent decision in *Pantoja v. American NTN Bearing Manufacturing Corp.*, 495 F.3d 840 (7th Cir. 2007), would not help Henry. There, we stated that in a termination case, "Once an employee can show (in the sense of raising an issue of material fact at the summary judgment stage) that he is meeting his employer's legitimate expectations (the second element), then the fact that the employer needs to find another person to perform that job after the employee is gone raises the same inference of discrimination that the continuation of a search does in the hiring situation." *Id.* at 846. In *Pantoja*, rather than contending that he was meeting his employer's legitimate expectations, the plaintiff maintained that he was subject to particularly strict employment standards because of his race. *Id.* at 847. We concluded that the plaintiff had not offered any evidence that the employer's expectations were tailored to race, as the plaintiff's misconduct was more egregious than that of the employees to whom he pointed. *Id.* Similarly here, Henry has not put forth evidence sufficient to support a finding that his employer tailored its expectations to race. His conduct was more egregious than that of the non-white officers he highlights. We agree with the district court that Henry did not demonstrate a prima facie case of discrimination on the basis of race under the indirect method, and, therefore, that he cannot avoid summary judgment on that basis.

### B.  Direct Method

Alternatively, a Title VII plaintiff can survive summary judgment by proceeding under the direct method of proving racial discrimination. *See Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006). To

avoid summary judgment under the direct method, Henry must introduce evidence showing that the decision to terminate him was motivated by animus based upon his race. *See Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007). Although labeled the "direct" method of proof, this method "is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (e.g., 'You're too old to work here.'), but also includes circumstantial evidence which suggests discrimination albeit through a longer chain of inferences." *Luks*, 467 F.3d at 1052. A plaintiff may use direct evidence, circumstantial evidence, or a combination of the two when proceeding under the direct method. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007). Circumstantial evidence of intentional discrimination can include: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (citations omitted).

Henry agrees that this case does not involve an admission by his employer that he was terminated on account of his race. Instead, he points to several circumstances which, he maintains, suggest that he was terminated because he is white. We disagree. Even when viewing together all the circumstances to which Henry points, he has failed to produce sufficient evidence that Jones decided to terminate his employment because of his race.

We begin with Henry's contention that the publicity surrounding Miles's booking suggests that Henry was

improperly terminated. He emphasizes, for one, that the defendants initiated the Internal Affairs Division investigation into the conduct that ultimately led to Henry's dismissal only after a local television station aired a videotape of the booking on its newscast. Moreover, he points out, Jones attended a community meeting where citizens expressed concern about the treatment Miles had received while in custody, and a newspaper published a letter from the Wisconsin Legislative Black and Hispanic Caucus stating that the Caucus would be carefully observing the police department's response to the issue. Henry suggests that Jones was contemplating a run for mayor and that political aspirations motivated him to terminate Henry after the booking was publicized.

Jones may or may not have been motivated by political dreams or by the publicity that surrounded the booking. But whether those were his motivations does not matter. At issue here is whether Henry has presented sufficient evidence that *race* motivated the decision to terminate him, not whether political goodwill or fear of bad publicity was the impetus for Jones's decision. Politicians routinely respond to bad press they receive on television, but it is not a violation of Title VII to take advantage of a situation to gain political favor. As to Jones's presence at the community meeting, we note also that even Henry acknowledges that during the ninety minutes that Jones fielded questions and complaints from the audience, Jones declined to comment on the videotape until an internal investigation had been completed and promised "everyone in the room the officer will have a fair investigation." Declining to comment does not suggest racial animus.

The decision to order an IAD investigation after seeing the videotape of the booking also does not suggest that race motivated the decision to terminate Henry. Henry argues on the one hand that the decision to dismiss him

was a "rush to judgment" and on the other that he should have been terminated sooner if his actions were egregious. We would be hard-pressed to say that the police chief's decision to wait for the results of the investigation before terminating Henry suggests a racial motivation for his firing. And even though other officers interviewed during the investigation supported Henry's account, the IAD report concluded that the videotape showed Henry initiating contact without provocation and that Henry had taunted Miles by patting his bicep after Miles was handcuffed. We do not find anything suspicious in the decision to impose discipline only after the investigation was complete.

Significant distinctions exist between a District Attorney's investigation into whether a person has committed a crime and the IAD's investigation of whether an officer violates a department rule, and we are not persuaded that Jones's refusal to rescind the discipline after the District Attorney's office declined to press charges suggests that Henry's race motivated the chief's decision. Henry also points to Jones's public announcement that he was referring the case to the Federal Bureau of Investigation even though the Board of Fire and Police Commissioners had determined that Henry acted appropriately. That a press release was issued announcing the referral could suggest that Henry is correct when he maintains that publicity surrounding the incident motivated the chief. But if so, that is not enough to establish a Title VII violation. Or, looking to the IAD report (which was apparently not before the Board) and videotape, Jones might have believed that Henry had acted improperly and that the FBI would interpret Henry's actions differently than the Board and District Attorney's office had. In short, there are many possibilities for Jones's announcement, but none in this record suggests that race motivated the referral.

Henry also points to a jury's conclusion during an earlier suit that the City of Milwaukee and Jones discriminated against seventeen white male police lieutenants on the basis of race or gender when they did not receive promotions to captain. *Alexander v. City of Milwaukee*, No. 03-C-611 (E.D. Wis. Mar. 29, 2005), *aff'd*, 474 F.3d 437 (7th Cir. 2007). That lawsuit, which involved decisions about qualifications and the extent to which an employer should promote gender and racial diversity in its leadership, concerned different questions than the one here—whether the defendants disciplined a white officer more harshly than they would a minority officer for the use of force against an arrested person. More importantly, the result of that suit is not enough to suggest that the termination decision here was made on the basis of race, especially when the defendants acknowledge that the negative publicity surrounding the airing of the tape led to the termination decision.

The other circumstances to which Henry points do not warrant significant comment. He contends that Jones's failure to appear at Henry's appeal hearing constitutes evidence of intentional discrimination, but we do not see the connection. He also argues that Jones was somehow unqualified to conclude whether Henry had violated the department's rule regarding mistreatment of prisoners because the chief was not a certified "defense and arrest tactics instructor." First, Jones had the benefit of thorough investigation and analysis from an officer who had been trained in the use of force, Sergeant Graham, the author of the IAD report. Second, as police chief, Jones was responsible for the conduct of his officers, *see* Wis. Stat. § 62.50(23), and it strains credulity to contend that he could not make disciplinary decisions based on a subordinate officer's actions.

The essence of Henry's argument is that the police chief made a mistake when he ordered Henry terminated,

and so a Title VII violation must have occurred. But there are many "mistaken" personnel decisions that do not violate federal law. *See, e.g., Guerrero v. Ashcroft*, 253 F.3d 309, 314 (7th Cir. 2001). The decision in this case, whether correct or not, does not raise a triable question as to whether it was made on account of Henry's race.

### III.  CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of the defendants is AFFIRMED.

A true Copy:

       Teste:

                          _____

                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*