In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1252

JUAN PANTOJA,

*Plaintiff-Appellant*,

*v.*

AMERICAN NTN BEARING
MANUFACTURING CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 4961—**Charles R. Norgle, Sr.,** *Judge.*

ARGUED JANUARY 3, 2007—DECIDED AUGUST 6, 2007

Before EASTERBROOK, *Chief Judge*, and WOOD and
WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* After working for nine years for
American NTN Bearing Manufacturing Corporation
("NTN"), Juan Pantoja was fired within days of his man-
agers' learning that he had complained about discrimina-
tion to the EEOC. Pantoja had not been a perfect employee
during the last year and a half of his tenure there; to the
contrary, he had been disciplined on a number of occa-
sions. Around the same time, however, he allegedly began
complaining to management that his supervisors were
mistreating him because he is Hispanic.

Not long after his termination, Pantoja brought this suit against NTN under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, alleging discrimination, harassment, and retaliation based on his race and national origin. The district court granted NTN's motion for summary judgment on all of the claims. Reviewing Pantoja's claims *de novo*, we too conclude that his discrimination and harassment claims cannot go forward. Pantoja has, however, identified material issues of fact with respect to his retaliation claims. We therefore affirm the district court's grant of summary judgment to NTN on the discrimination and harassment claims but remand the retaliation claims for further proceedings.

**I**

Pantoja began his employment with NTN in 1993 as a machine operator. In 1997, he became a mechanic in the maintenance department, where he worked under the supervision of Robert Cloyd and Joe Maney. Eventually, Pantoja was promoted from the entry-level mechanic's position (M-0) to a higher one (M-3). James Cusimano, a white male, had moved up the ranks more quickly. NTN hired Cusimano as a janitor in the maintenance department in 1998, but by the end of that year Cloyd and Maney promoted him to the M-0 entry-level mechanic's position. In 2001, Cusimano was promoted from the M-2 level to the M-4 level, thereby skipping over the M-3 rank where Pantoja remained.

At some point around early 2001, Pantoja began complaining to upper level management officials, including NTN Human Resources Director Stuart Moir. The specifics of these complaints are in dispute. Pantoja contends that his complaints included allegations that he was being treated badly, in comparison to Cusimano, because of his race and national origin. NTN characterizes the com-

plaints as expressions of frustration over Cusimano's promotion, devoid of any allegations of unlawful discrimination. NTN admits, however, that "Maney confirms that he was aware that Pantoja had complained to Moir in 2001 about Cusimano's rapid advancement." Pantoja contends that there were meetings among Cloyd, Maney, and Moir to discuss his concerns, but that those three reached no decisions.

In February 2002, Pantoja, still at the M-3 level, sought a promotion to the M-4 level. Cloyd prepared his employment review. This was Pantoja's first formal evaluation after his complaints to HR. Although Pantoja had received an "exceeds expectations" rating in his previous formal evaluation, on this evaluation he received the lower "meets expectations" rating. NTN contends that Pantoja was performing adequately at the M-3 level, but was not meeting the higher expectations in place for the M-4 level. Part of its evaluation was based on a September 2001 skill check that Maney described as "very subjective."

In the wake of his unsuccessful bid for a promotion, Pantoja complained again to HR. In March or early April 2002, Assistant HR Director Darlene Myles met with Pantoja. Pantoja told Myles that he believed that his supervisors were discriminating against him. He recounted his belief that the company had unfairly promoted Cusimano ahead of him, and that Cloyd and Maney were giving Cusimano special treatment, including better assignments. He was also concerned that there might be disciplinary warnings in his file that he had never seen, because Cloyd had threatened to write him up. Myles passed along these concerns to Peter Datka (who had replaced Moir as HR Director) and reviewed Pantoja's file. As Pantoja had feared, she found a notice of a verbal warning that had not been signed by management, contrary to NTN's policy.

Pantoja's record showed two of these procedurally irregular warnings from April 2001, one for creating an inaccurate record about maintenance of a pump and the other for failing properly to maintain a grinding system. A year later, in April 2002, more warnings appear, but once again they were incomplete and Pantoja was not given proper notice of them. This occurred on April 17, April 23, and May 14, 2002. On June 3, 2002, Cloyd gave Pantoja his first formal warning that HR had approved. It accused him of faulty work on April 23 that had caused a spill. (Pantoja asserts that the delay in processing this warning violated company policy.) In June 2002, Myles and Pantoja had another meeting, at which Pantoja complained of continued harassment by Cloyd. Myles promised to talk to Datka. She claims that she did so, but Datka denies that any such conversation took place, either about Pantoja or about the general treatment of Hispanic employees at NTN. In August 2002, Pantoja received another warning from Cloyd for causing a spill, but he protested. Pantoja claims that the latter warning, on which he wrote that he was being singled out and "Employee refuses to sign," has not been produced in this case, but has been replaced with a phony document in the record.

On Saturday, August 10, 2002, Pantoja was assigned to work for four hours. He arrived at work at 5:00 am. At approximately 7:00 am he received a page from another employee, Shannon Garcia, who was nearby with a flat tire and could not get to work. Pantoja tried to reach someone in the plant to let them know about the situation, but he could not. He left NTN anyway without punching out, drove to the place where Garcia was waiting, attempted to fix her car but could not, and then drove Garcia back to NTN. He was gone for approximately 30 minutes. Later that day, Garcia paged Pantoja again, because she needed to use the telephone in a locked office. He met her at that office and let her in. He punched out of

work at 9:00 am. On Monday, August 12, Maney questioned Pantoja about the incident. Later, Maney spoke to Datka about whether the incident warranted terminating Pantoja's employment.

On August 29, Cloyd wrote in his diary that Myles had told him about Pantoja's EEOC complaint. That same day, Datka told Maney that the company was going to fire Pantoja because he had left the company's premises without permission on August 10. In that meeting, Datka and Maney discussed how to explain to Pantoja that he was being fired for the specific reason of violating company policy by leaving the premises without permission on August 10. Then Datka and Maney met with Pantoja on August 30. Contrary to the script, however, Datka did not focus on the August 10 incident. Instead, according to Maney, Datka told Pantoja he was being fired for "a number of failures" and his performance generally. This was the first in a succession of shifting accounts from NTN. During the EEOC investigation, NTN stated that Pantoja was fired for "repeated absenteeism." In the course of the present litigation, NTN stated that Pantoja was fired "for numerous reasons, including, but not limited to, unsatisfactory work record, job negligence[,] endangering persons and/or property, absence from work position without leave or authorization, dishonesty in representations to supervisors, and insubordination." Later, NTN stated that Pantoja was discharged because of his "unauthorized and/or unreported absence from his work station on August 10, 2002" and his "[d]ishonesty in statements made by him . . . in describing his absence from his workstation during his shift on 8/10/2002." Yet during his deposition Datka said that Pantoja was not fired for dishonesty, but rather for leaving work without permission on August 10, 2002.

**II**

Pantoja alleges that illegal discrimination on the basis of race and national origin lay behind NTN's refusal to promote him, its disciplinary actions, and its ultimate decision to fire him. Pantoja is proceeding under the so-called indirect method of proving employment discrimination. This compels us to begin with the barnacle-laden burden-shifting inquiry inaugurated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

It is worth noting, in this connection, that there has been a subtle evolution in the way that courts describe the *McDonnell Douglas* requirements for a *prima facie* case of discrimination, at least when the adverse action at issue is the employee's termination. The district court described the required elements as follows: "(1) that [plaintiff] is a member of a protected class; (2) that he was meeting his employer's legitimate performance expectations; (3) that he suffered an adverse employment action; and (4) that he was treated less favorably than similarly situated individuals who are not members of his protected class." If we trace back the source of that particular formulation, we come to our decision in *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177 (7th Cir. 1997). *Coco* involved employment termination allegedly based on the plaintiff's age. It did not, in so many words, require the plaintiff to point to someone else who was "similarly situated." Rather, *Coco* stated that a person complaining of age discrimination had to show, among other things that he or she was "replaced by a much younger person." *Id.* at 1178.

*McDonnell Douglas* itself was a failure to hire case. The Supreme Court there said that, as the fourth element of a *prima facie* case, the plaintiff had to show that "after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802. This is not quite the

same as requiring plaintiff to introduce evidence into the record of one or more people "similarly situated" to him in all pertinent respects. Indeed, the Court in *McDonnell Douglas* warned against an unduly rigid approach to Title VII cases. In a termination case, for example, an inflexible rule requiring plaintiff to point to a similarly situated comparator would automatically doom a suit brought by, for example, any employee who is the sole occupant of a particular job class at her employer. We criticized just this sort of narrowness in *Crawford v. Indiana Harbor Belt R.R.*, 461 F.3d 844 (7th Cir. 2006). There, we held that "the plaintiff should have to show only that the members of the comparison group are sufficiently comparable to her to suggest that she was singled out for worse treatment." *Id.* at 846.

Canvassing the many employment cases that have dealt with terminations, we find the description in *Matthews v. Allis-Chalmers*, 769 F.2d 1215 (7th Cir. 1985), closest to the mark in the way it applies the approach of *McDonnell Douglas*. There we said that the plaintiff had to show, as the fourth element of his *prima facie* case, "that his employer sought someone to perform the same work after he left." *Id.* at 1217. Once an employee can show (in the sense of raising an issue of material fact at the summary judgment stage) that he is meeting his employer's legitimate expectations (the second element), then the fact that the employer needs to find another person to perform that job after the employee is gone raises the same inference of discrimination that the continuation of a search does in the hiring situation. This is the approach we will take to our review of Pantoja's discrimination claims.

## A

The district court focused almost exclusively on Pantoja's termination, and so we begin our review there. As in any appeal from a grant of summary judgment, we construe

the facts in the light most favorable to the non-moving party, here Pantoja. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006).

No one disputes that Pantoja, a Hispanic, is a member of a protected class and that his termination constitutes an adverse employment action. The question is whether Pantoja could convince a trier of fact that he was meeting NTN's legitimate expectations and that NTN sought someone to do Pantoja's work after Pantoja's termination. The district court concluded that he failed on both points.

These two inquiries, however, are not hermetically sealed off from one another. In some cases the employer's job expectations themselves may be tainted with discrimination. Thus, in *Peele v. Country Mutual Insurance Co.*, 288 F.3d 319, 329-330 (7th Cir. 2002), we held that

> [w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner (*i.e.*, applied expectations to similarly situated male and younger employees in a more favorable manner), the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a *prima facie* case, stave off summary judgment for the time being, and proceed to the pretext inquiry.

*Id.* In such a case, the plaintiff needs some evidence to raise the inference of discriminatory expectations. (This raises the specter of an infinitely regressing set of *McDonnell Douglas* inquiries, but we have done our best to avoid that outcome.) In *Peele*, this court found adequate evidence indicating that the employer had applied certain standards to the plaintiff but not to similarly situated employees who were not members of the same protected class. 288 F.3d at 330. Pantoja, therefore, might try to show that NTN had two different sets of employment expectations, one for Hispanics and the other for non-Hispanics.

That is precisely what he did. Rather than argue that he was meeting NTN's standards, Pantoja alleged he was subject to particularly strict employment standards because he is Hispanic. (This was probably a wise tactic, given the fact that rules requiring competent use of equipment and permission to leave the workplace are hardly exceptional.) Pantoja contends that Cusimano—a similarly situated, non-Hispanic employee—was not subjected to discipline for the same poor performance, namely failing to prevent spills from overflowing coolant tanks. Even if we were to assume, however, that Cusimano was responsible for the same number of spills, of the same degree of severity, that is not enough to save Pantoja's case. In addition to causing spills, Pantoja also left work without notifying a supervisor. There is no evidence that Cusimano also committed some other form of misconduct, whether leaving the workplace without permission or something comparable, other than failing to prevent spills. In short, Pantoja has not offered any evidence that would support the proposition that NTN's expectations were tailored to the race or national origin of the employee.

Pantoja tries to save his claim by pointing to two other disciplinary warnings that NTN gave to employees for time card violations. This evidence is unhelpful, though, because the race and national origin of these employees is not recorded. Moreover, only one of the warnings was for leaving the building without notifying a supervisor. The other was for failing to punch a time card. In addition, the warning received by the employee who left without notifying a supervisor was his second warning overall, while Pantoja's warning for the same infraction was his third warning overall. The other employee's warning stated that "[f]urther disciplinary action will be taken on the next occurrence up to and including discharge," which is consistent with Pantoja's treatment.

No matter which way we slice it, Pantoja has failed to put forth enough evidence to raise an inference of discrimination with regard to his termination. Therefore, the district court properly granted summary judgment to NTN on this claim.

B

Pantoja also alleges that unlawful discrimination was the reason for the discipline he received and for NTN's refusal to promote him. But not every criticism or disciplinary measure is an "adverse employment action" for Title VII purposes. Here, Pantoja made no showing that the disciplinary measures NTN imposed, whether consistently with its own internal policies or not, affected his "compensation, terms, conditions or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). There is no evidence of a constructive demotion or a loss of pay or other benefits. Nor has Pantoja presented evidence tending to show that the promotion tests were applied differently to him as compared to his fellow, non-minority employees. We understand that he suspects that this is the case, but his own subjective belief cannot substitute for evidence. His previous year's evaluation is not enough to show discriminatory treatment, both because it is too remote from the time of the company's action and because later evidence casts a different light on his job performance. See *Clay v. City of Chi. Dep't of Health*, 143 F.3d 1092, 1094 (7th Cir. 1998). Pantoja's contention that there was a company policy under which he was entitled to earlier consideration for a promotion also offers him no support, because there is no evidence in the record that this policy is actually enforced.

In the end, Pantoja failed to submit evidence in response to NTN's motion for summary judgment that created a genuine issue of fact under the indirect method of proving

discrimination. NTN was therefore entitled to prevail on these theories.

## III

Pantoja also alleges that NTN retaliated against him because he complained about harassment based on his national origin and race. He raised these claims under both Title VII and § 1981, but the district court did not consider the § 1981 retaliation claim because it viewed this court's decision in *Hart v. Transit Mgmt. of Racine, Inc.*, 426 F.3d 863, 866 (7th Cir. 2005), as holding that § 1981 does not provide a cause of action for retaliation claims. As we have since clarified,

> [o]ur analysis in *Hart* was limited to the narrow issue of whether an individual who was not the subject of discrimination could assert claims of retaliation for complaining about the discrimination of others. We held that section 1981 did not protect against retaliation in such circumstances. But *Hart* has no application . . . where the plaintiff is plainly asserting retaliation stemming from discriminatory acts targeting him.

*Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 398 (7th Cir. 2007). See also *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005). Because the analysis for these two claims is the same, *Humphries*, 474 F.3d at 404, and because our review is *de novo* in any event, the district court's decision to limit its inquiry is of no consequence at this point. The discussion that follows applies equally to both theories of recovery.

## A

In *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640 (7th Cir. 2002), we reviewed the two ways in which a Title VII plaintiff can establish retaliation:

The plaintiff in a retaliation case should have two (and only two) distinct routes to obtaining/preventing summary judgment. One, the more straightforward, the one that is unrelated to *McDonnell Douglas*, is to present direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains. If the evidence is uncontradicted, the plaintiff is entitled to summary judgment. If it is contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive; in that event the defendant is entitled to summary judgment because he has shown that the plaintiff wasn't harmed by retaliation.

*Id.* at 644. *Stone* continued as follows:

The second route to summary judgment, the adaptation of *McDonnell Douglas* to the retaliation context, requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

*Id.*

There is no question that Pantoja's complaints to HR about perceived discrimination constitute protected activ-

ity, which is the first thing he must show under either approach. Both approaches also require the employee to demonstrate an adverse action—under the direct method, he must show that it was a *result* of the protected activity, and under the indirect method he must show that he, and no one else who did not complain, suffered the adverse action. Termination is "unquestionably a materially adverse action." *Burnett v. LFW Inc.*, 472 F.3d 471, 482 (7th Cir. 2006). It is less clear whether the disciplinary warnings also amounted to adverse employment actions on their own.

In the retaliation context, although the adverse action does not have to be "related to employment or occur at the workplace," it must be "materially adverse to a reasonable employee." *Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2409 (2006). This means the action would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415. This is a context-driven inquiry, *id.*, and we have declined to rule categorically that warnings cannot be adverse actions. See *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 462 (7th Cir. 2007) (assessing two disciplinary actions and concluding based on the context that they were not adverse). Taking the facts in the light most favorable to Pantoja, there is enough in the record here for a factfinder to conclude that these warnings were materially adverse.

The more complicated issue is whether a reasonable trier of fact could find that either the warnings or the termination were caused by Pantoja's complaints. Although, as we observed in *Stone*, 281 F.3d at 644, mere temporal proximity is normally not enough to create an issue of fact on causation in the absence of other evidence, this is not to say that temporal proximity has zero evidentiary weight. To the contrary, as we recently observed in *Boumehdi v. Plastag Holdings, LLC*, 2007 WL 1583980

(7th Cir. June 4, 2007), "[t]he causal link of a retaliation claim is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action." *Id.* at *8.

The district court thought that Pantoja had failed to establish the requisite sequence of events because it read the record as indicating that some of the warnings issued to Pantoja came "prior to any alleged oral complaint made by Pantoja to the Human Resources department." In our view, however, the record can be read to indicate otherwise. NTN contends that Pantoja "does not allege having made any complaint to management about racial discrimination before April 2001." Yet Pantoja states that "[a]t some point shortly before or during 2001, plaintiff began to complain to upper level management officials, including Corporate Human Resources (HR) Director, Stuart Moir, that Cloyd harassed him and that Cusimano was receiving more favorable treatment." By August 2001, Moir was replaced by Peter Datka, and NTN acknowledges that "Maney was aware that Pantoja spoke to Moir, [although] he perceived it only as a complaint in the general sense." At the very least, the record shows by NTN's own admission that Pantoja made complaints by the summer of 2001. Meanwhile, Pantoja was issued the first warnings of his career in April 2001, during this same general time period. Furthermore, Pantoja argues that NTN should not be entitled to rely on the 2001 warnings, as it is undisputed that they were not presented to him in accordance with company policy.

NTN also attacks Pantoja's testimony that his complaints included allegations of racial discrimination as insufficient to support a finding about when he began complaining. We have repeatedly held, however, that "[o]ral testimony if admissible will normally suffice to establish a genuine issue of material fact." *Randolph v.*

*Ind. Reg'l Council of Carpenters, Millwright Local Union 1003*, 453 F.3d 413, 416 (7th Cir. 2006). We conclude that there are disputed issues of material fact about when Pantoja first complained about discriminatory treatment and whether the April 2001 warnings came shortly *after* his supervisors learned of the complaint.

Pantoja also testified that at some point in April 2002, after his unsuccessful bid for promotion in February 2002, he met with HR official Myles and complained that he and another Hispanic employee were being treated unfairly because of their race. NTN alleges that Pantoja's next warning was dated April 17, 2002, and was delivered orally. Pantoja has no recollection of this warning, and there is no documentation supporting it other than a reference to it on another warning dated April 23, 2002. This later warning was not signed until May 14, 2002, by anyone other than Cloyd, about whom Pantoja complained to Myles. It was not presented to and signed by Pantoja until June. Viewed favorably to Pantoja, the record thus indicates that the 2002 warnings were not delivered prior to May 14, shortly after Pantoja formally spoke with HR about his concerns. In this respect, Myles's testimony is helpful to Pantoja. NTN attempts to discredit Myles, stating that she "hat[ed] her job, chafed at being subordinate to Manager Datka, groused about her job to [Andrea] Dittman, and merely yearned for the day she would be fired." As it undoubtedly knows, however, these are arguments for a jury, not for a judge deciding a summary judgment motion.

We are left with a credibility contest between Maney's testimony and the combined testimony offered by Pantoja and Myles on the subject of Pantoja's 2001 and 2002 complaints. Taking the view most favorable to Pantoja, the record shows that his complaint came first, and that it was followed shortly thereafter by his first warnings,

then came a series of complaints, followed again by a wave of warnings.

NTN argues that this factual dispute is beside the point, because, it argues, the evidence shows that Cloyd and Maney developed their poor opinion of Pantoja in 2001 after they learned that he had looked through some of their paperwork and learned that he was paid less than Cusimano. But that argument more properly relates to NTN's effort to show a legitimate, non-discriminatory reason for its actions against Pantoja. The timing of Pantoja's warnings is suspicious enough to suffice to support his *prima facie* case. Other circumstantial evidence also supports the inference of retaliation. Pantoja notes the significant delay between the dates of his warnings and the dates on which the warnings were presented to him, the warning he contested and that he alleges was replaced in his file, and his testimony that he was given warnings for spills even though Cloyd had instructed his department to ignore spills.

Circumstantial evidence also supports Pantoja's claim that his termination was a retaliatory measure. At some point at least several days after the August 10, 2002, incident, Maney and Datka conferred about whether Pantoja's actions warranted some action, including possible termination. They took no action at that time. Cloyd's journal indicates that he learned about Pantoja's EEOC complaint on August 28, 2002. On August 29, 2002, the relevant managers decided to terminate Pantoja, and he was out the door on August 30, the very next day. This chain of events is so close, and so clearly tied to Cloyd's discovery of the EEOC complaint, that a reasonable finder of fact could infer the requisite causation from it.

B

All this, of course, is only enough for Pantoja's *prima facie* case of retaliation. Although it technically did not need to do so, given its rejection of Pantoja's initial showing, the district court considered whether NTN put forth a legitimate, non-discriminatory reason for Pantoja's termination. The court concluded that NTN "fired Pantoja due to the several [warnings] that were given to him for poor job performance, and failure to punch out his time card."

That is certainly one of the reasons NTN has given for Pantoja's termination, and we assume that this is the way it would attempt to counter Pantoja's evidence of timing at a trial. Pantoja, in turn, might exploit the fact that NTN as a company has offered numerous reasons for his termination. In some explanations, NTN, or an NTN manager, states that Pantoja was fired solely for the August 10, 2002, incident. At other times, NTN represents that Pantoja was fired for some combination of his warnings, poor performance, leaving the plant without notifying his supervisor, or his dishonesty. In *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2001), this court held that "[s]hifting and inconsistent explanations can provide a basis for a finding of pretext . . . [if] the explanations [are sufficiently] shifting and inconsistent to permit an inference of mendacity." *Id.* at 577. Perhaps NTN has a theory under which these various accounts are consistent. It might try to prove, for example, that no one was satisfied with Pantoja, and that each manager had a different concern. But all this shows only that there is a disputed issue of fact about the true reason for Pantoja's firing. A trier of fact might believe that the company did not see his previous difficulties as firing offenses until Pantoja complained. If that is the way it sees the facts, it would be entitled to conclude that the real reason for Pantoja's termination was retaliation.

**IV**

We have little to say about Pantoja's last claim, which is that he was harassed because of his race or national origin. One of the elements of a harassment theory is that harassment must be severe or pervasive enough to alter the terms and conditions of employment. *Boumehdi*, 2007 WL 1583980 at \*3. The district court correctly recognized that Pantoja's claim of harassment is based on a few isolated incidents, one involving Cloyd and Maney's discriminatory statements to a coworker and one involving a discriminatory comment by Cusimano to Pantoja. This depicts conduct that is neither severe nor pervasive, and thus the district court correctly ruled for NTN on this claim.

**V**

Taking the record, as we must at this stage, in the light most favorable to Pantoja, we conclude that a trier of fact could infer that he was the victim of retaliation prohibited by Title VII. (A trier of fact might well rule the other way too, of course; nothing we say here should be understood to imply that Pantoja has already proven his case.) The district court properly granted summary judgment to NTN on Pantoja's discrimination and harassment claims. We AFFIRM the district court's judgment on the discrimination and harassment claims, but REVERSE and REMAND the retaliation claims for further proceedings in accordance with this opinion.

No. 06-1252                                                      19

A true Copy:

    Teste:

                _____
                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*