In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2946

GILBERTA DORSEY,

*Plaintiff-Appellant,*

*v.*

MORGAN STANLEY, formerly known as
MORGAN STANLEY DEAN WITTER, a corporation,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 C 3269—**Jeanne E. Scott**, *Judge.*

ARGUED SEPTEMBER 17, 2007—DECIDED NOVEMBER 9, 2007

Before FLAUM, RIPPLE, and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* Gilberta Dorsey worked as a branch manager for Morgan Stanley until April 19, 2001, when she was asked to step down from her position following an investigation into personnel and compliance issues at her office. Dorsey filed suit against Morgan Stanley under Title VII, bringing claims of gender discrimination, sexual harassment, and unlawful retaliation. The district court granted Morgan Stanley's motion for summary judgment on all claims. Dorsey only appeals the district court's grant of summary judgment on her retaliation claim under the direct method of proof. For the

following reasons, we affirm the district court's grant of summary judgment.

## I.  Background

Morgan Stanley hired Dorsey in October 1999 to become the branch manager of a soon-to-be opened office in Quincy, Illinois. After the Quincy office opened, it, along with the other branch offices in the Central Illinois area, reported to Morgan Stanley's Springfield, Illinois complex. Dorsey and the other branch managers in the Central Illinois area reported directly to Gary Lowery, the complex manager. Lowery in turn, reported to regional manager Jeff Swartz and regional director Jeff Adams, both of whom worked in Chicago, Illinois. Swartz, not Lowery, had supervisory authority to make final decisions regarding hiring, disciplining, transferring, promoting, demoting, and terminating branch managers within the Central Illinois area.

The Quincy branch opened in fall 2000, approximately one year after Dorsey was hired. In the interim, Dorsey worked at Morgan Stanley's branch office in Hannibal, Missouri, which later consolidated with the Quincy branch. From the outset of her employment, Dorsey received regulatory compliance and personnel training from Barbara Fleck, the area administrative manager. Fleck worked at the Springfield, Illinois complex and was responsible for regulatory compliance issues at the branch offices and unofficially assisted in human resource issues. Dorsey acknowledges that Fleck provided her with branch manager manuals and helped prepare her for licensing examinations, but claims that Fleck and Lowery did not provide her with management training as she requested.

When the Quincy branch opened, Dorsey served as both branch manager and a financial advisor. Dorsey

managed three other financial advisors and two administrative/sales assistants. By January 2001, Dorsey was having significant personnel issues with one of her assistants, Bonnie Zabuski. In a January 26, 2001 letter, Dorsey voiced her concerns to Zabuski, stating Zabuski would be terminated if she did not resolve ten specific performance issues.

In that same month, Dorsey had a meeting with Suzanne Leonard, a human resources employee in New York. Dorsey intended to discuss some remaining compensation issues regarding her hiring, as well as the personnel issues she was having with Zabuski. During the course of Dorsey's meeting with Leonard, Dorsey also spoke about multiple incidents of alleged sexual misconduct on Lowery's part. According to Dorsey, Lowery had gone out to dinner with Dorsey and her boyfriend after her first day of work in October 1999 and tried to kiss her. Approximately one year later, Dorsey went out to dinner with Lowery and his assistant, and Lowery allegedly made an unwelcome sexual advance. Dorsey also relayed how Lowery had made comments regarding Dorsey's attire and that Lowery had cursed at Dorsey when he found out she was engaged. After hearing this, Leonard advised Dorsey to discuss these issues with Lowery. Dorsey followed this advice, but did not utilize any of the formal mechanisms Morgan Stanley had in place for reporting sexual harassment or workplace discrimination.

In spring 2001, personnel complaints regarding Dorsey came to Morgan Stanley's attention. On March 13, 2001, Zabuski contacted Lowery, complaining that Dorsey had insulted her. Later that day, Zabuski called the Morgan Stanley Help Line to lodge a formal complaint against Dorsey. Ten days later, Terrie Welper-Lowis, another assistant in the Quincy office, also called the Help Line to complain about Dorsey. Lyndelle Phillips, a Morgan Stanley senior attorney, investigated these complaints.

Phillips initially contacted Lowery to obtain facts about the working relationships of Zabuski and Welper-Lowis, and then spoke with Zabuski and Welper-Lowis by telephone. Phillips then traveled to Quincy with human resources generalist Cindy DeLeo to interview the employees at the Quincy office. Phillips first conducted interviews with all the employees at the Quincy office other than Dorsey. After these initial interviews, Phillips then conducted a group interview with Lowery, Fleck, and Lowery's assistant, Denise Brown. The next day, Phillips interviewed Dorsey.

Fleck and Welper-Lowis, in addition to their interviews, also provided Phillips with notes detailing compliance, personnel, and management issues regarding Dorsey. In the notes Fleck prepared for her interview with Phillips, she addressed issues involving Dorsey with respect to advertising, clients, office policies, and two regulatory compliance matters. The first compliance issue involved the proposed sale of fraudulent treasury notes. Dorsey's cousin had asked Dorsey whether she was interested in having Morgan Stanley assist in the sale of $100,000,000 in treasury notes. Dorsey consulted with Morgan Stanley officials in New York and Atlanta on the matter, who quickly determined the notes were bogus. Although a Morgan Stanley compliance attorney initially called for Dorsey's immediate termination, Lowery urged Morgan Stanley to look into the matter more deeply. It was ultimately determined that Dorsey acted innocently in the matter and did not engage in misconduct. The other issue occurred in October 2000, when Dorsey sold an initial public offering to her then-boyfriend's brother. Fleck discussed the issue with the New York compliance office and kept Lowery apprised of the matter. While nothing wrong was occurring, Fleck "reminded [Dorsey] that the risk/reward she is taking with this account does not make a lot of sense." Welper-Lowis, for her part, sent Phillips a

letter after her interview which detailed various incidents involving Dorsey that occurred between May-August 2000.

After completing her investigation, Phillips concluded Dorsey was ill-suited to continue as a Morgan Stanley branch manager. Phillips recommended to both Adams and Swartz that Dorsey be removed from her position as branch manager and given the option of either continuing with Morgan Stanley as a financial advisor or resigning. Adams and Swartz accepted Phillips's recommendation. On April 5, 2001, Swartz and Lowery met with Dorsey and gave her the option of working at another branch office as a financial advisor or resigning. Citing professional and family commitments in Quincy, Dorsey said it was not possible for her to move and resigned. She then accepted employment with another brokerage firm in Quincy.

## II.  Analysis

### A.  Standard of Review

The Court reviews the district court's grant of summary judgment *de novo. Jackson v. County of Racine*, 474 F.3d 493, 498 (7th Cir. 2007). Summary judgment is appropriate when there are no genuine issues as to any material facts. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The court must construe all facts and reasonable inferences in favor of the nonmoving party. *South v. Ill. EPA*, 495 F.3d 747, 751 (7th Cir. 2007). However, "[i]Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

### B.  Retaliation Under the Direct Method of Proof

Dorsey's only argument on appeal is that the district court erred in granting summary judgment on her retaliation claim under the direct method of proof. Under the direct method, a plaintiff is required to show that "(1) [s]he engaged in statutorily protected activity; (2) [s]he suffered an adverse action taken by the employer; and (3) [there was] a causal connection between the two." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (*quoting Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)). Dorsey is permitted to prove these three elements by means of direct or circumstantial evidence. *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 902-903 (7th Cir. 2006).

Dorsey suffered an adverse employment action when she was asked to either accept a lower position at another branch or resign. *See Goodwin v. Bd. of Tr. of Univ. of Illinois*, 442 F.3d 611, 619 (7th Cir. 2006) ("[A] demotion, even if it is later rescinded," constitutes an adverse employment action.); *see also Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007) ("Termination is 'unquestionably a materially adverse action.'" (quoting *Burnett v. LFW Inc.*, 472 F.3d 471, 482 (7th Cir. 2006))). Dorsey argues this demotion was the result of her complaints to Leonard regarding Lowery. The district court properly granted summary judgment on this claim since, regardless of whether Dorsey's conversation with Leonard did in fact constitute a statutorily protected activity, no reasonable juror could find a causal connection between this complaint and Dorsey's forced resignation.

Causation in this case depends upon Lowery's role in Dorsey's demotion. Here, it is uncontested that Lowery was not directly involved in this decision, which was made by Swartz upon Phillips's recommendation. This

court has recognized however, that "if a manager with a retaliatory motive is involved in the decision to terminate an employee, that retaliatory motive, in some circumstances, may be imputed to the company, even if the manager with a retaliatory motive was not the ultimate decisionmaker." *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000). Therefore, Dorsey must offer evidence showing that Lowery influenced the decision to demote her, either by withholding relevant information or providing false information to Phillips or Swartz. *David v. Caterpillar, Inc.*, 324 F.3d 851, 861 (7th Cir. 2003).

Dorsey points to several facts in the record as circumstantial evidence of Lowery's role in the investigation. These include the fact that Zabuski's Help Line complaint occurred the same day Zabuski spoke with Lowery, Phillips's conversation with Lowery prior to flying to Quincy, and Fleck's role in the investigation in light of her close working relationship with Lowery. The inferences Dorsey attempts to draw from these facts however, are based on mere speculation and thus are insufficient to overcome summary judgment. It is true that Zabuski called the Help Line the same day she complained to Lowery. Zabuski's sworn testimony however, is that Lowery never directed her to call the Help Line or complain about Dorsey. Dorsey's assertion that a juror could find Lowery played a role in Zabuski's complaint is simply too speculative, especially in light of the fact that Dorsey failed to depose Zabuski on this matter.

The same holds true with respect to Lowery's conversation with Phillips before she flew to Quincy. Phillips testified that her call to Lowery was to establish basic facts about Zabuski's and Welper-Lowis's working and reporting relationship. Before Phillips decided to travel to Quincy, she also had discussions with Zabuski, Welper-Lowis, and Fleck. Dorsey has not offered any evidence

indicating that Lowery conveyed any misinformation regarding Dorsey to Phillips, and again, Dorsey did not depose Phillips and thus failed to develop the record in this regard.

Dorsey's final argument, regarding Fleck's involvement in the investigation, also fails. Dorsey asserts that Lowery's involvement in the investigation is evident because in the notes Fleck provided to Phillips, Fleck wrote, "[Lowery] ADVISED ME TO KEEP THEM WELL DAYTIMED." This statement however, did not pertain to the notes Fleck prepared for Phillips, but rather was part of Fleck's earlier report on Dorsey's October 2000 IPO compliance issue. This notation therefore has no bearing on Lowery's involvement in Phillips's investigation. In addition, any broader argument that Lowery influenced Fleck's report to Phillips also fails, since Dorsey has not offered any evidence contradicting Fleck's testimony that Lowery in no way instructed her to prepare these notes or provide them to Phillips.

Dorsey also claims there is additional circumstantial evidence in the record that would lead a reasonable juror to conclude a causal connection exists in this case. This includes the fact that the incidents relayed by Fleck and Welper-Lowis to Phillips occurred before Dorsey's conversation with Leonard, the fact that Phillips initiated her investigation based on Help Line complaints that were not fully documented, and that the broad scope of Phillips's investigation was not proportional to the initial complaints. These arguments however, all miss the mark. Dorsey does not dispute that the only individual with a retaliatory motive against her is Lowery. Yet none of these pieces of circumstantial evidence implicates Lowery's involvement in Dorsey's demotion. Dorsey has not offered any evidence reflecting that Lowery influenced Fleck's or Welper-Lowis's reports to Phillips. Similarly, Dorsey has not shown that Lowery

improperly influenced Phillips's decision to initiate the investigation or the manner in which the investigation was conducted. Therefore, Dorsey has failed to present any evidence that would lead a reasonable juror to find that her demotion was the result of unlawful retaliation.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's ruling granting summary judgment in Morgan Stanley's favor.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*