NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 4, 2008
Decided April 9, 2008

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

No. 07-2014

| | |
|---|---|
| JEFFERY D. JOHNSON, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Illinois, Eastern Division. |
| v. | |
| SIEMENS BUILDING TECHNOLOGIES, INC., | No. 05 C 3836 |
| *Defendant-Appellee*. | Rebecca R. Pallmeyer, *Judge*. |

**O R D E R**

Jeffery Johnson sued his former employer, Siemens Building Technologies, Inc., under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and 42 U.S.C. § 1981, alleging that the company discriminated against him because of his race and sex, and that it retaliated against him for complaining about the discrimination. The district court granted summary judgment for Siemens, and Johnson appeals. Johnson has presented no evidence of discrimination and has not shown that Siemens's asserted reason for its disciplinary actions against him is pretextual; therefore, we affirm the district court's grant of summary judgment.

## Background

Johnson, who is black, was hired by Siemens in 1994. At the time of his firing, Johnson worked as a logistics coordinator (or traffic coordinator) in Siemens's domestic traffic department. His duties primarily included tracking the shipment throughout the United States and Canada of raw materials that control the temperature within a building. In addition to the domestic department, Siemens also maintains an international traffic department, which handles shipments to parts of the world other than the United States and Canada.

Although Johnson worked for the domestic department, he made clear over the course of roughly five years that he wanted to be trained in international shipping. Siemens never responded to his requests. According to the company, no formal policy exists regarding when an employee will receive extra job training. But Johnson's co-worker Joanna Zaucha (a white woman) was trained in international traffic shipping. Johnson felt that he was being discriminated against and threatened to notify the EEOC. Siemens asserted that it gave Zaucha the training because, at the time, her shift ended roughly five hours later than Johnson's, and thus her schedule was better-suited to it. Additionally, Siemens noted, Zaucha was the only employee who worked the late-night shift, so she needed the training in order to complete after-hours international trading and shipment assignments.

Siemens employs a "Respectful Workplace" policy, which requires employees to "be respectful towards all others . . . at all times while on Company premises." Notwithstanding the policy, Johnson was involved in several altercations while he worked at Siemens. The first, a fistfight with one of his co-workers, took place in October 1999; both he and the co-worker were suspended for five days. Then in October 2002 Johnson received a disciplinary warning for "verbally abusing" another employee in the cafeteria. Johnson also had a contentious relationship with his one-time supervisor, Clinton Salonis. Salonis and Johnson had had a series of arguments at work and in October 2003, Salonis (who is also black) was demoted from his supervisory position. Both he and Johnson were warned at that time that "any further disruptions of this nature will result in formal disciplinary action up to and including termination of employment." Despite this warning, the friction between Johnson and Salonis continued, and in October 2004 both men were placed on a three-day suspension for being "argumentative and disrespectful." Zaucha was never involved in any altercations at Siemens and was never disciplined by the company.

On a typical day, Johnson was required to work from 8:00 a.m. to 4:45 p.m. But

Siemens's domestic traffic department closed at 6:00 p.m. and the company mandated that at least one employee remain at work until that time. Also, according to Siemens, its customers' demands at times exceeded the amount of work that its employees could complete during regular business hours. Accordingly, if no one volunteered, Siemens would require one of its employees to work overtime. Johnson informed his supervisors that he could not work the extra hour and fifteen minutes because he had to pick up his daughter from daycare before it closed at 6:00 p.m. Siemens already was aware of Johnson's obligation, and to accommodate him, the company previously had asked another worker to fill in for him. But because of staffing shortages in both the domestic and international departments, that employee was needed elsewhere and could no longer work overtime in Johnson's stead. At one point, Siemens also hired a temporary employee to lessen the mandatory overtime requirements. Whenever it did require extra work from Johnson, Siemens endeavored to warn him at least a day in advance, so that he could make alternate arrangements for his child. But Alexander Kentfield, director of logistics, also reminded him that failure to work overtime would be seen as a failure to complete a job assignment and could lead to his being fired. According to Kentfield, Johnson told him "I have a life outside of Siemens, and I'm leaving."

Zaucha also had a child who needed to be picked up from daycare. Siemens chose to accommodate this need by giving her a temporary reprieve from mandatory overtime. Johnson complained to the company that Zaucha received this form of "preferential treatment" because she is a white woman. He also believed that Siemens was falsifying documents to help Zaucha qualify for a subsidized daycare program. Siemens, on the other hand, asserted that both Salonis and Johnson voluntarily agreed to adjust their schedules and work overtime until Zaucha, who was going through a divorce at the time, could find other childcare options. Also, by that point, the company's staffing concerns were less serious than they earlier had been. Zaucha was permitted to work reduced hours for roughly two months, but when Johnson and Salonis stopped volunteering for overtime, Siemens made Zaucha return to her normal schedule. According to Siemens, from January to November 2004, Zaucha worked 114 hours' overtime while Johnson worked 65 hours. Additionally, during the months that Zaucha's schedule was shortened, Salonis worked 52.75 hours' overtime while Johnson worked only 13.5 hours.

The incident that ultimately led to Johnson's firing occurred in November 2004. According to Johnson, Zaucha had approached him with a question and in the middle of their discussion, his telephone rang. Johnson took the phone call, which, he asserts, angered Zaucha. When he tried to resume the conversation, Zaucha refused to acknowledge him. In order to get her attention, Johnson asserts, he tapped her arm with a piece of paper. Zaucha's version of the incident differed. According to Zaucha, when she asked the

question of Johnson, he retorted that she should learn how to do her job properly. Then, she stated, Johnson rolled up a piece of paper and tapped her on the shoulder and in the face. Zaucha was upset by Johnson's actions and reported him to human resources. In his deposition, the senior human resources coordinator recounted that Zaucha came to his office in tears, asserting that she had had an altercation with Johnson. After an investigation, Siemens credited Zaucha's version and terminated Johnson's employment. Siemens's reason for firing Johnson was that he repeatedly had violated its workplace policy of being respectful toward all others while on company premises.

Johnson initiated this lawsuit in June 2005, alleging that he had been discriminated against because of his race and sex, and that Siemens retaliated against him for opposing unlawful discrimination. After discovery closed, Siemens moved for summary judgment. The district court reasoned that Siemens's decision not to provide Johnson with international training did not constitute an adverse employment action because it was not central to his job as a domestic traffic coordinator. Additionally, the court concluded that Siemens reasonably accommodated Johnson's schedule to avoid interfering with his childcare obligations. Finally, the court determined that Johnson's suspensions and firing were not related to his complaints of discrimination. The district court therefore granted Siemens's motion.

**Analysis**

On appeal Johnson first argues that the district court erred in granting summary judgment on his claims of race and sex discrimination. Summary judgment is appropriate when there are no genuine issues of material fact. *See Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007). We review the district court's grant of summary judgment de novo. *See Pantoja v. Am. Bearing Mfg. Corp.*, 495 F.3d 840, 843 (7th Cir. 2007). Johnson does not attempt to prove race or sex discrimination by the direct method, but instead relies on the indirect method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To set forth a prima facie case of discrimination under the indirect method, Johnson has to show that (1) he is a member of a protected class, (2) he was meeting his employer's legitimate job expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside of the protected class were treated more favorably. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). In actions brought under both Title VII and § 1981, a plaintiff must satisfy the same prima facie requirements. *See id.*

Johnson contends that Siemens discriminated against him because of his race and sex by failing to train him in international shipping. The district court assumed for the purposes of argument that Johnson satisfied the first two elements of his prima facie case,

but determined that Siemens's failure to provide international training did not constitute an adverse employment action. The record supports that determination. An adverse employment action is a "'materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002) (quoting *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)); *see also Pantoja*, 495 F.3d at 847. "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citation and internal quotation marks omitted).

Here Johnson worked in the domestic traffic department, but wanted formal training in international shipping because he thought that the international department paid more, and that the training might improve his chances of becoming an international traffic coordinator either for Siemens, or for another company. But nothing in the record suggests that members of the international traffic unit were better compensated. And Johnson admitted that most employees in the international unit were trained after they began working in that unit, not before. *Cf. Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002) (noting that employee's "purely subjective preference for one position over another" was insufficient to support his discrimination claim). Moreover, Siemens planned to merge the domestic and international departments and intended to train the entire domestic group, including Johnson, in international shipping. That the company had not yet done so does not amount to an adverse employment action, and thus this "failure to train" cannot serve as the basis of his discrimination claims.

Johnson next claims that Siemens discriminated against him by occasionally making him work overtime, which, he asserts, shows that the company refused to accommodate his responsibility to pick up his child from daycare. Although Johnson's brief is somewhat unclear, he seems to argue that Siemens did not respond to his childcare obligations because he is a man. As we have noted management decisions are not "necessarily rendered with discriminatory animus based on sex just because a male and female employee are involved." *Greenslade v. Chicago Sun-Times, Inc.*, 112 F.3d 853, 865 (7th Cir. 1997). Men who allege sex discrimination generally have a high burden because, historically, employers have not discriminated against them. *See Gore v. Ind. Univ.*, 416 F.3d 590, 592 (7th Cir. 2005) ("[I]t is the unusual employer who discriminates against majority employees.") (quoting *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 456-57 (7th Cir. 1999)). Then again, childcare has traditionally been associated with women, so Johnson may be able to argue that the higher burden does not apply to him.

But, assuming for the purpose of argument that he has set forth a prima facie case of

discrimination, Johnson cannot show that Siemens's reason for the action—that increases in the amount of work necessitated the overtime policy—was pretextual. To survive summary judgment, Johnson had to show that this reason was a "deliberate false-hood." *Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007) (internal citation and quotation marks omitted); *see Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560-61 (7th Cir. 2007). Johnson argues that Siemens's reason is pretext for sex discrimination because, despite its business needs, the company did not require Zaucha to work overtime for a two-month period. Johnson does not acknowledge that Siemens *did* accommodate his daycare obligations. The company's staffing concerns also had become less of an issue during the months that Siemens permitted Zaucha to leave exactly at the end of her shift. Additionally, notwithstanding her "grace period" from August through October 2004, Zaucha's total overtime hours for the year were far greater than both Johnson and Salonis. And Salonis, not Johnson, worked the bulk of the overtime hours when Zaucha's schedule was altered. Johnson has failed to show that Siemens's reason is pretext for sex discrimination; therefore, summary judgment was properly granted on this claim.

Johnson next contends that Siemens suspended him in October 2004 and then fired him one month later in retaliation for his complaints about race and sex discrimination. Siemens, on the other hand, asserts that these actions were taken against Johnson because he repeatedly got into both physical and verbal conflicts at work. Therefore, to survive summary judgment, Johnson had to show that Siemens's reason was pretextual, *see Sublett v. Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006), that is, that the company's explanation was a lie, *Hague v. Thompson Distrib. Co.*, 439 F.3d 816, 823 (7th Cir. 2006). Here Johnson had been warned on several occasions that his behavior at work was unacceptable and that it could lead to his being suspended or fired. Though he questions the timing of his suspension and later firing, Johnson has not shown that these actions were motivated by anything other than his disciplinary history. *See, e.g., Kodl*, 490 F.3d at 563; *Stone v. City of Ind. Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("[M]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue.").

Finally, Johnson raises a claim of retaliatory discharge under Illinois law. Because the district court dismissed all of Johnson's federal claims, it declined to exercise supplemental jurisdiction over the state-law claim. We conclude that the district court reasonably exercised its discretion in dismissing the claim. *See Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906-08 (7th Cir. 2007).

AFFIRMED.